**George C. REEVES, Plaintiff,**

v.

**AMERICAN BROADCASTING COMPANIES, INC.**

**Roone ARLEDGE and Everett Erlick, Defendants,**

v.

**Joseph O. GIAIMO, Counterclaim Defendant.**

**No. 81 Civ. 5177 (HFW).**

United States District Court, S.D. New York.

March 15, 1983.

---

Giaimo & Vreeburg by Joseph O. Giaimo, Elisabeth A. Vreeburg, Forest Hills, N.Y., for plaintiff and counterclaim defendant.

Coudert Brothers by Eugene L. Girden, Michael J. Calvey, Dennis R. Pearson, Peter M. Nelson, Hawkins, Delafield & Wood by Philip R. Forlenza, New York City, for defendants.

## MEMORANDUM DECISION

WERKER, District Judge.

This is a diversity action in which plaintiff George C. Reeves ("Reeves") alleges causes of action sounding in breach of contract, fraudulent misrepresentation, libel and prima facie tort. The matter presently is before the court on the motions of Reeves and counterclaim defendant Joseph O. Giaimo ("Giaimo") for an order pursuant to Fed.R.Civ.P. 12(b)(6) dismissing the first, third, fourth and sixth counterclaims asserted by defendants Roone Arledge ("Arledge") and Everett Erlick ("Erlick")[1] and on the motion made by Arledge and American Broadcasting Companies, Inc. ("ABC") pursuant to Fed.R.Civ.P. 56 for summary judgment on the fourth cause of action alleged in the complaint.

## FACTS

For the present purposes, the relevant facts are as follows. Reeves formerly was employed by ABC as the Senior Vice President, Theatrical Motion Pictures and Television Affairs, for ABC Entertainment, a division of ABC. One of his duties in that capacity was to supervise the contracts department of ABC Entertainment. Sometime in August 1979, Jennifer Martin ("Martin"), an attorney assigned to the contracts department, began to question certain payments that ABC had been making to Spelling-Goldberg Productions ("Spelling-Goldberg"), the producer of the television series "Charlie's Angels." Martin apparently became convinced that these payments were part of a conspiracy to divert money rightfully owed to Natalie Wood and Robert Wagner, who shared the profits from the Charlie's Angels show with Spelling-Goldberg. Martin circulated to her superiors memoranda setting forth her charges and eventually complained to the office of the Los Angeles District Attorney. That office and the Securities and Exchange Commission ("SEC") thereafter commenced investigations, but no criminal or civil charges ever were brought.

The complaint alleges that it was the plan of Erlick and Arledge to foster the formation of an unfavorable public impression of ABC by maintaining a code of silence with regard to the Martin charges. Reeves claims that Erlick and Arledge intended to create an inference that ABC was guilty of wrongdoing and selected him to be the scapegoat to shoulder the blame. According to Reeves, the purpose of the plan was to place ABC in an unfavorable light in the hopes of bringing about the removal of Elton Rule ("Rule"), the President of ABC, so that Erlick and Arledge could advance in the corporate hierarchy. The fourth cause of action listed in the complaint charges that, as part of the plan to depose Rule, Reeves was defamed in an ABC news report that was televised, under the supervision of Arledge, nationwide from Washington, D.C. on the evening of August 25, 1980. The substance of the report as quoted in the complaint is reproduced in the appendix to this decision. The complaint charges that the news report was broadcast for the purpose of causing the public to believe that he had engaged in criminal activity and improperly and dishonestly had performed his duties at ABC.

The counterclaims allege that Giaimo, Reeves' attorney, acting on behalf of him-

---

**1.** Defendants' amended answer originally asserted nine counterclaims against Reeves and Giaimo. By stipulation, all of the counterclaims asserted by ABC subsequently were withdrawn, as were the second, fifth, seventh, eighth and ninth counterclaims asserted by Arledge and Erlick.

self and Reeves, defamed Arledge and Erlick in conversations with newspaper reporters. Specifically, the counterclaims charge that, prior to the commencement of this action, Giaimo discussed the allegations of the complaint with a New York Daily News columnist and a reporter for the New York Post and stated that, among other things, Arledge and Erlick had tried to embarrass Rule in order to gain higher positions at ABC. According to the counterclaimants, Giaimo made the statements with the expectation and intent that they would be published by the reporters. The counterclaims also allege that, when speaking to the New York Daily News columnist, Giaimo compared the power struggle at ABC with "Network," a motion picture about corrupt practices in a fictitious television industry, and stated that the situation was worse at ABC.

## DISCUSSION

### The Counterclaims

The first issue to be decided is whether the counterclaims are compulsory. Giaimo contends that they are not and therefore must be dismissed as against him because there is no diversity of citizenship between him and the counterclaimants. If the counterclaims are compulsory under Fed.R. Civ.P. 13(a), they are within the court's ancillary jurisdiction and no independent basis of federal jurisdiction is required. E.g., *Harris v. Steinem*, 571 F.2d 119, 121–22 (2d Cir.1978); *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1070 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Establissement Tomis v. Shearson Hayden Stone, Inc.*, 459 F.Supp. 1355, 1364 (S.D.N.Y.1978). On the other hand, if the counterclaims are permissive, they would have to be dismissed as against Giaimo because of the absence of an independent jurisdictional predicate. *Harris v. Steinem*, 571 F.2d 119, 122 (2d Cir.1978); *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1070–71 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Establissement Tomis*

*v. Shearson Hayden Stone, Inc.*, 459 F.Supp. 1355, 1364 (S.D.N.Y.1978).

■ According to Fed.R.Civ.P. 13(a), a counterclaim is considered compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." In the Second Circuit, the standard for determining whether a claim is compulsory is the "'logical relation' test." *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1071 (2d Cir. 1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978). Under this test, the court must

> analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.... [P]recise identity of issues and evidence between claim and counterclaim is not required.

*Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir.1978) (citations omitted). In addition, even if the counterclaim withstands the logical relation test, it still may be categorized as permissive if it is "based solely on the filing of the main complaint and allegedly libelous publications thereafter." Id. at 125.

■ The court finds that the counterclaims are compulsory. They certainly meet the logical relation test. The counterclaims and many of the allegations of the complaint arise out of the same set of operative facts, that is, the purported scheme engaged in by Arledge and Erlick to advance their positions at ABC. Reeves claims that, in the course of that alleged scheme, Arledge and Erlick committed misrepresentation, defamation and prima facie tort. Arledge and Erlick assert that Giaimo's conversations with the press regarding the scheme were false and defamatory. Thus, one of the main focal points of the resolution of the issues raised in the complaint and the counterclaims will be whether such a scheme existed. The court therefore finds that the interests of judicial economy and fairness would best be served by permitting the complaint and the coun-

terclaims to be adjudicated in one lawsuit. Furthermore, the counterclaims are based not upon the complaint or subsequent defamations, but rather upon alleged defamations that occurred before the complaint was filed. They therefore do not fall within the rule of *Harris v. Steinem,* supra. Accordingly, no independent jurisdictional predicate is needed over the counterclaims against Giaimo.

■ The next question is whether the counterclaims are premature. It is well-settled that a cause of action for malicious prosecution arising out of the filing of the complaint is premature and therefore cannot be asserted as either a compulsory or a permissive counterclaim. 3 Moore's Federal Practice P. 13.13 (1982). In this case, however, the counterclaims do not contain any allegation that could be construed as making a claim for malicious prosecution. They therefore are not premature.

■ Before turning to the substantive issues raised by the motions of Reeves and Giaimo, the court must note two basic principles. First, the allegations of the counterclaims must be accepted as true. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965). Second, the counterclaims cannot be dismissed "unless it appears beyond doubt that the [counterclaimants] can prove no set of facts ... which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted).[2]

■ Reeves and Giaimo claim that Giaimo's conversations with the reporters are absolutely privileged by statute and under the common law. Section 74 of the New York Civil Rights Law, N.Y.Civ. Rights Law § 74 (McKinney 1976), provides that "the publication of a fair and true report of any judicial proceeding" is protected by an absolute privilege. Id. Similarly, under the common law, any statement made during the course of and that is relevant to a judicial proceeding is absolutely privileged. *Uni-Service Risk Management, Inc. v. New York State Ass'n of School Business Officials,* 62 App.Div.2d 1093, 403 N.Y.S.2d 592 (3d Dep't 1978) (per curiam); *Kenny v. Cleary,* 47 App.Div.2d 531, 363 N.Y.S.2d 606 (2d Dep't 1975) (per curiam); *Rosen v. Brandes,* 105 Misc.2d 506, 432 N.Y.S.2d 597 (Sup.Ct. Nassau County 1980).

■ The courts of New York have held that the statutory and common-law privileges attach only after the action is commenced and that commentary on a pleading is not privileged if the pleading has not yet become a part of the proceeding. E.g., *Uni-Service Risk Management, Inc. v. New York State Ass'n of School Business Officials,* 62 App.Div.2d 1093, 403 N.Y.S.2d 592 (3d Dep't 1978) (per curiam); *Kenny v. Cleary,* 47 App.Div.2d 531, 363 N.Y.S.2d 606 (2d Dep't 1975) (per curiam); *May v. Syracuse Newspapers, Inc.,* 250 App.Div. 155, 294 N.Y.S. 867 (3d Dep't 1937). In this case, the counterclaims allege that Giaimo's conversations with the reporters took place before the complaint was filed. Since the action therefore had not yet been commenced, Fed.R.Civ.P. 3, neither privilege applies. Thus, the counterclaims cannot be dismissed on that ground.

■ Finally, Reeves and Giaimo contend that the counterclaims should be dismissed because Arledge and Erlick have failed to plead special damages.[3] Arledge

---

2. Although the parties have submitted matters outside the pleadings, including affidavits, "they are not sufficiently comprehensive for the [c]ourt to treat the motion as one for summary judgment," and therefore have been excluded. *Lachman v. Bell,* 353 F.Supp. 37, 38 (S.D.N.Y. 1972).

3. Reeves and Giaimo assert in their notices of motion that the counterclaims must be dismissed because Arledge and Erlick are public figures and cannot prove malice as a matter of law. They have failed, however, to submit any support for that contention. Moreover, Arledge and Erlick have pled malice, and, for the purposes of this motion, that is sufficient. Giaimo also contends that the counterclaims should be dismissed as against him for lack of personal jurisdiction and insufficient process and service of process. The court, however, finds this argument to be devoid of merit and warrants no further discussion.

and Erlick claim that they have been defamed per se and therefore need not plead special damages. See 34 N.Y.Jur., Libel and Slander § 3 (1964). A statement is defamatory per se if it "tends to disparage a person in the way of his office, profession or trade." *Nichols v. Item Publishers, Inc.*, 309 N.Y. 596, 601, 132 N.E.2d 860, 862 (1956) (citations omitted); see *McCullough v. Certain Teed Prods. Corp.*, 70 App. Div.2d 771, 417 N.Y.S.2d 353 (4th Dep't 1979) (per curiam). The question whether a statement is defamatory per se is to be decided by the court, *Pauling v. News Syndicate Co.*, 335 F.2d 659, 663 (2d Cir.1964), cert. denied, 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561 (1965); *Robinson v. Bantam Books, Inc.*, 339 F.Supp. 150, 157 (S.D.N.Y. 1972), and, in this case, the question must be answered in the affirmative. At the time Giaimo's statements were made, Arledge was the President of ABC News and Erlick was a Senior Vice President and the General Counsel of ABC. There is no question that Giaimo's statements to the press impugned the integrity of Arledge and Erlick as corporate officers and raised serious questions of professional impropriety. Thus, the statements were defamatory per se, and the pleading of special damages is unnecessary.[4]

### The Fourth Cause of Action of the Complaint

█ ABC and Arledge argue that summary judgment should be granted in their favor on Reeves' fourth cause of action because the news report in which Reeves claims to have been defamed is absolutely privileged under state law. Unlike the counterclaims, Reeves' defamation

cause of action has contacts with many states. Thus, the first issue that arises is which of those state's laws control. While it is true that, in diversity actions such as this, the court must apply the law of the state in which it sits, the court also is required to apply that state's choice of law principles. *Klaxon Co. v. Stentor Elec. Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under the law of New York, it is the law of the state that has the most significant relationship with the issue involved that governs. E.g., *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 255 N.E.2d 765, 307 N.Y.S.2d 647 (1970); *Babcock v. Jackson*, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963).

█ The court finds that the law to be applied to the fourth cause of action is that of California. Notwithstanding that Arledge and ABC are residents of New York and that the report was broadcast nationwide from Washington, D.C., Reeves was a resident of California when this occurred. Thus, it was in California where Reeves most suffered whatever injuries resulted from that report. Furthermore, the report centered on investigations of activities that took place in California. There is no question that California has the most significant interest in the subject matter of the dispute and its law must therefore control. *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 255 N.E.2d 765, 307 N.Y.S.2d 647 (1970).

█ Section 47(4) of the California Civil Code provides a privilege for

a fair and true report in a public journal, of (1) a judicial, (2) legislative, or (3) other public official proceeding, or (4) of

---

4. This case does not fall within the "single instance" rule, which applies to statements charging a person with mistake or professional misconduct on a single occasion. E.g., *November v. Time, Inc.*, 13 N.Y.2d 175, 194 N.E.2d 126, 244 N.Y.S.2d 309 (1963); *Mason v. Sullivan*, 26 App. Div.2d 115, 271 N.Y.S.2d 314 (1st Dep't 1966); *Twiggar v. Ossining Printing & Publishing Co.*, 161 App.Div. 718, 146 N.Y.S. 529 (2d Dep't 1914), appeal dismissed mem. 220 N.Y. 716, 116 N.E. 1080 (1917). Under that rule, such statements are not defamatory per se and are not actionable unless special damages are pleaded.

*November v. Time, Inc.*, 13 N.Y.2d 175, 194 N.E.2d 126, 244 N.Y.S.2d 309 (1963). In this case, however, Giaimo's statements are more of the type that connote "a lack of character or a total disregard of professional ethics.... [These] words would certainly injure [a person] in his professional capacity and are [defamatory] per se." *Mason v. Sullivan*, 26 App.Div.2d 115, 117, 271 N.Y.S.2d 314, 316 (1st Dep't 1966) (citations omitted); see *November v. Time, Inc.*, 13 N.Y.2d 175, 194 N.E.2d 126, 244 N.Y.S.2d 309 (1963).

anything said in the course thereof, or (5) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant shall have been issued.

Cal.Civ.Code § 47(4) (West Supp.1982). The privilege is absolute and therefore cannot be defeated by the presence of malice. *Conklin v. Sloss*, 86 Cal.App.3d 241, 246 n. 1, 150 Cal.Rptr. 121, 125 n. 1 (1978).

Relying exclusively on New York law, Reeves argues that the news report is not privileged because it was based upon conversations that were not a part of an official proceeding, because the privilege does not apply to reports of grand jury proceedings and because the report was not "fair and true." Although the court already has decided that New York law does not control, the court nevertheless will proceed to determine the validity of Reeves' contentions under California law.

■■■ With respect to Reeves' first argument, the courts of California have held that the privilege provided by Cal.Civ. Code § 47(4) covers reports on the history of judicial proceedings such as statements of district attorneys and police officers and police department records. *Hayward v. Watsonville Register-Pajaronian & Sun*, 265 Cal.App.2d 255, 71 Cal.Rptr. 295 (1968); *Glenn v. Gibson*, 75 Cal.App.2d 649, 171 P.2d 118 (1946), overruled on other grounds, *Lipman v. Brisbane Elementary School Dist.*, 55 Cal.2d 224, 359 P.2d 465, 11 Cal.Rptr. 97 (1961) (en banc). Moreover, the privilege applies "'even though the publication is made outside the courtroom and no function of the court or its officers is invoked.'" *Hayward v. Watsonville Register-Pajaronian & Sun*, 265 Cal. App.2d 255, 71 Cal.Rptr. 295, 298 (1968) (quoting *Albertson v. Raboff*, 46 Cal.2d 375, 380–81, 295 P.2d 405, 409 (1956) (en banc)). In this case, the news report disclosed that the grand jury had begun calling witnesses and identified those witnesses. It further reported that the SEC also was investigating. It stated that the investigations had been triggered by Martin's charges and discussed what those charges

were. In addition, it identified the sources of its information. The court finds that the report constituted a history of the investigations being conducted by the grand jury and the SEC. These activities were newsworthy and the public was entitled to know the bases therefor. The report thus was entirely proper and falls within the section 47(4) privilege. *Conklin v. Sloss*, 86 Cal. App.3d 241, 248, 150 Cal.Rptr. 121, 125 (1978); *Hayward v. Watsonville Register-Pajaronian & Sun*, 265 Cal.App.2d 255, 71 Cal.Rptr. 295, 299 (1968).

■■■ The court also must reject Reeves' assertion that the privilege does not apply to grand jury proceedings. While the court has found no authority that squarely addresses this issue, California courts have been quite liberal in extending the privileges provided by Cal.Civ.Code § 47 to various types of proceedings. E.g., *Brody v. Montalbano*, 87 Cal.App.3d 725, 732, 151 Cal. Rptr. 206, 211 (1978), cert. denied, 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979); *Tiedemann v. Superior Court*, 83 Cal. App.3d 918, 924, 148 Cal.Rptr. 242, 246 (1978); *Hayward v. Watsonville Register-Pajaronian & Sun*, 265 Cal.App.2d 255, 71 Cal.Rptr. 295, 299 (1968). Indeed, in *Tiedemann v. Superior Court*, 83 Cal.App.3d 918, 148 Cal.Rptr. 242 (1978), the court held that the proceedings of an investigative and enforcement branch of the Internal Revenue Service were within the scope of Cal.Civ.Code § 47. Id. at 926, 148 Cal. Rptr. at 247. The court also determined that communications made to that agency for the purpose of prompting regulatory enforcement action were privileged. Id. Although Reeves claims that the privilege should not apply here because grand jury proceedings are mandated by law to be secret, the regulations of the Internal Revenue Service similarly require that, in most cases, "[i]nvestigatory records compiled for law enforcement purposes" must be kept confidential where disclosure would "deprive a person of a right to a fair trial or an impartial adjudication." 26 C.F.R. § 601.701(b)(vii) (1982). Thus, based upon the present state of the law, the court finds

that, if faced with the issue, a California court would hold Cal.Civ.Code § 47 applicable to grand jury proceedings.

 The remaining question is whether the newscast was a "fair and true report." Although this question generally is one to be decided by the jury, *Handelsman v. San Francisco Chronicle*, 11 Cal. App.3d 381, 386, 90 Cal.Rptr. 188, 190 (1970), where the facts are undisputed, the issue may be decided by the court as a matter of law. *Hayward v. Watsonville Register-Pajaronian & Sun*, 265 Cal. App.2d 255, 71 Cal.Rptr. 295, 300 (1968). Under California law, a report is fair and true if it "captures the substance, the "gist" or "sting" of the subject proceedings." *Kilgore v. Younger*, 30 Cal.3d 770, 777, 640 P.2d 793, 797, 180 Cal.Rptr. 657, 661 (1982) (en banc); see *Handelsman v. San Francisco Chronicle*, 11 Cal.App.3d 381, 387, 90 Cal.Rptr. 188, 191 (1970). As the court stated in *Handelsman.*

> the publication is to be measured by the natural and probable effect it would have on the mind of the average reader.... The standard of interpretation to be used in testing alleged defamatory language is how those in the community where the matter was published would reasonably understand it....

Id. at 387, 90 Cal.Rptr. at 191; see *Kilgore v. Younger*, 30 Cal.3d 770, 777, 640 P.2d 793, 797, 180 Cal.Rptr. 657, 661 (Cal.1982) (en banc).

 In this case, it is undisputed that the grand jury and the SEC were conducting investigations of the Martin charges, and that is exactly what was reported in the subject newscast. Reeves' assertion that the effect of the news report was to convey the impression that he was part of illegal activity is unwarranted. The court finds as a matter of law that, as far as Reeves is concerned, the only reasonable conclusion to be drawn by the average viewer of the newscast is that he was shocked at what Martin had stated in her memoranda. The report therefore was fair and true.

 Accordingly, the court finds that, since the news report is absolutely privileged under California law, the motion of ABC and Arledge for summary judgment on Reeves' fourth cause of action must be granted. In view of this disposition, the court need not address the · remaining grounds relied upon by ABC and Arledge in support of their motion.

## CONCLUSION

For the reasons discussed above, the motions of Reeves and Giaimo to dismiss the first, third, fourth and sixth counterclaims asserted by Arledge and Erlick are denied. The motion by Arledge and ABC for summary judgment on the fourth cause of action of the complaint is granted. There being no just cause for delay, Arledge and ABC are directed to submit an appropriate order on notice within ten (10) days after the entry of this order.

## APPENDIX

### FRANK REYNOLDS

In Los Angeles today, a grand jury began calling witnesses to testify in an investigation of the relationship between ABC television and entertainment program producers. Here in Washington the Securities and Exchange Commission is conducting a parallel investigation into what is reportedly an industry-wide practice of doing business with producers without written contracts. Among the witnesses called today, David Soul and Paul Michael Glaser, better known as Starsky and Hutch; George Reeves, a former senior Vice President of ABC television, and in the dark jacket, Ronald Sunderland, an ABC Vice President for business affairs. Here is a background report on the story from correspondent Charles Gibson.

### CHARLES GIBSON

(OPENING INTRO FOR CHARLIE'S ANGELS SHOW) For 4 years they have been angels for Charlie, sweethearts for America, and a financial gold mine for the ABC network. It is ironic. Charlie's An-

gels are investigators, but their show has now touched off investigations in both Los Angeles and Washington that go to the heart of the way television operates its multibillion dollar entertainment industry. Charlie's Angels is produced by Aaron Spelling and Leonard Goldberg who last season had more prime time TV programming than any other producers. Their shows have been a virtual hit machine for ABC, producing well over 100 million dollars in revenues for the network last year. One of the investigations comes from a Los Angeles grand jury. Their questions: "Did Spelling-Goldberg attempt to defraud the co-owners of Charlie's Angels?" most notably actor Robert Wagner and his wife Natalie Wood who were due a 46 percent share of the program's profits. And "Did ABC officials participate in such a scheme?" The allegations being investigated originate with this woman, Jennifer Martin, a former ABC lawyer in Los Angeles who has alleged Spelling-Goldberg and ABC may be guilty of grand theft. ABC News has obtained copies of her internal memoranda. The scheme she alleges involves Spelling-Goldberg's means of billing. Last season they charged ABC 510,000 dollars per episode of Charlie's Angels, but then they added money for what is called an exclusivity provision, payment for keeping them under exclusive contract to ABC. It was this bill, September 1979, for 80,000 dollars a month in exclusivity payments that raised Ms. Martin's suspicions. For the exclusivity payments go directly to the producers and are not divided up with the others who may own a share of the program like the Wagners. In a memo, Ms. Martin pointed out quote "I did not understand why ABC was being billed for exclusivity, since Aaron Spelling and Leonard Goldberg are already exclusive to ABC." She took her concerns to ABC Vice President Ron Sunderland who then went to his boss Vice President George Reeves. It was Sunderland, she claims, who told her bluntly that with the exclusivity billing Spelling-Goldberg were "Blanking the Wagners out of their money."

## GEORGE REEVES

Now I said to Ron, I said, "Ron did you say that? That's crazy man. How the hell do you know something like that? He said "Well I ... I was just ... I blew my top." I said ... he said, "I don't even remember if I said that George."

## CHARLES GIBSON

Both Reeves and Sunderland were subpoenaed by the grand jury. When Ms. Martin said she thought the scheme constituted grand theft, she alleges in a memo that Sunderland agreed, saying quote "Yes, I knew it when I made the deal." But Sunderland still ordered the payments to be continued though he refused an interview with ABC News. Spelling-Goldberg meanwhile say the accusations are nothing more than innuendo and distortion. They took out a 2 page ad in a trade publication last week to echo earlier denials.

## AARON SPELLING

There was never, never any effort to deprive Mr. and Mrs. Wagner of 1 cent of the profit they would share as a result of their profit participation in Charlie's Angels.

## CHARLES GIBSON

The Securities and Exchange Commission is also investigating ABC's relations with producers and its accounting practices. Spelling-Goldberg at one point last season was receiving 4 million dollars a week from ABC primarily on deals based on handshakes not contracts. There exist, as one former Spelling-Goldberg employee told ABC News, a very cozy relationship between the producers and the network. For example, producer Goldberg, ABC network President Elton Rule, and the lawyer and business advisor they both share are partners in a multi-million dollar California land deal which includes purchase of this shopping center. It should be stressed of course how well Spelling-Goldberg have done for ABC. The Mod Squad, Family, Starsky and Hutch, Fantasy Island, Hart to

Hart, the Love Boat, and Charlie's Angels, are all theirs. And investigators stress there is nothing wrong with a close relationship between the producers and ABC officials, but SEC officials say they're checking to see whether multi-million dollar deals between the 2 can be concluded on a handshake and still insure that ABC stockholders are adequately protected. Jennifer Martin in one of her memos says when she took her concerns to ABC Vice President Sunderland he told her don't ask questions. But the Los Angeles grand jury and the SEC are now doing just that. Charles Gibson, ABC News, Washington.

FRANK REYNOLDS

A spokesman for the Los Angeles District Attorney said today the grand jury will not at this time be asked to return an indictment, and he noted that no charges have been filed. ABC Television has declined to comment until the investigations are completed. The company said again today it is cooperating with both inquiries.

Complaint P103 (emphasis omitted).