**AROCHEM INTERNATIONAL, INC., Arochem Corporation, and William R. Harris, Plaintiffs,**

v.

**Harold W. BUIRKLE, Defendant.**

**No. 90 Civ. 3824.**

United States District Court, S.D. New York.

June 24, 1991.

Shereff, Friedman, Hoffman & Goodman (Richard D. Weinberg, of counsel), New York City, for plaintiff Harris.

Whitman & Ransom (Richard F. Lawler, of counsel), New York City, for plaintiffs Arochem Intern., Inc. and Arochem Corp.

Hinckley, Allen, Snyder & Comen (Charles E. Schaub, Robert F. Sylvia, of counsel), Boston, Mass., for defendant Buirkle.

## MEMORANDUM OPINION

STANTON, District Judge.

Plaintiffs sue defendant Harold W. Buirkle for defamation and for tortious interference with a contract and with a business relationship. At the close of plaintiffs' presentation of their case to the jury, the court directed a verdict for defendant.

## BACKGROUND

This case is a skirmish in the battle between plaintiff William R. Harris and Mr. Edwin E. Wells, Jr. (not a party to this lawsuit) for the shares in Arochem International, Inc. and Arochem Corporation ("Arochem") held by "Victory" (comprising Victory Oil Company, Victory Holding Company and the Crail Fund—none of whom is a party to this lawsuit) which might give Harris or Wells control of Arochem.

Defendant Buirkle is an ally of Mr. Wells, with whom he made an October, 1989 Joint Litigation Agreement (Joint Tr. Exh. 21) in which Buirkle agreed to help Wells finance his litigation expenses and related costs of preserving Wells' rights in Arochem, and received rights to purchase an equity interest in Arochem if Wells succeeded in buying out Victory's and Harris' interest. *Id.* Buirkle has advanced $1,850,000 to Wells under that agreement. (Stipulated Facts ¶ 11).

In 1987, Mr. Wells had helped plaintiff Harris obtain financing from Victory to enable Harris to form Arochem, in return for which Mr. Wells and Victory collectively received a portion of Arochem's common stock. Mr. Harris, a Connecticut resident, is Arochem's founder, chairman, president and majority shareholder. Arochem is in the petroleum and petrochemical business and has its executive offices in Connecticut. (Stip. Facts ¶¶ 1, 3, 5).

Beginning in 1988, disputes concerning Arochem's operation arose among the three parties. Because of these disputes, Victory decided to sell its interest in Arochem either to Wells or to Harris. Wells claims that sometime in March, 1989 he made a binding agreement with Victory to purchase its interest. (Stip. Facts ¶¶ 4–6).

On April 13, 1989, Victory filed suit in the United States District Court for the Central District of California seeking, among other things, a declaration that it was free to sell its interest in Arochem to persons other than Wells. Wells answered and counterclaimed, alleging that Victory had (i) repudiated its contract to sell him its interest in Arochem, (ii) repudiated its contractual obligation to obtain his consent to Victory's sale of its Arochem interests, and (iii) denied, in bad faith, the existence of its contract to sell him its Arochem interest. On July 17, 1989, Harris sued both Wells and Victory in the United States District Court for the District of Connecticut. On August 28, 1989, Wells sued Harris in the same court and also asserted derivative claims against Victory. (Stip. Fact ¶¶ 7, 9).

In November, 1989, Harris and Victory entered into a Stock Purchase and Settlement Agreement which provided for Harris' purchase, and Victory's sale to him, of

its interest in Arochem (Joint Tr. Exh. 12). That Agreement was executed in Connecticut.

Then at Mr. Wells' request, Robert Johnson, Eric Johnson, and Sherry Hutchinson of Victory met with Edwin Wells and defendant Buirkle in Los Angeles, California, on December 20 and 21, 1989. Before beginning their discussions, the participants signed a Memorandum (Joint Tr. Exh. 70) which stated in part:

The undersigned have agreed to meet together to attempt to resolve business and legal disputes between and among themselves, including settlement of claims that have been or might be brought in litigation presently pending between and among them in California and Connecticut. It is the intention of the parties that the meeting shall be deemed a compromise negotiation within the meaning of Rule 408 of the Federal Rules of Evidence. As a condition of participating in these settlement discussions, the participants have each agreed that all discussions at such meeting, to be held on December 20 and 21, 1989, in Los Angeles, California, shall be confidential settlement discussions, to be used solely for the purposes of settlement.

At the meeting, Mr. Wells urged that Victory should sell its Arochem interest to him, rather than to Mr. Harris, who (he claimed) was looting Arochem, putting the money into offshore accounts, and preparing to escape from the jurisdiction of the United States courts. According to plaintiffs, defendant Buirkle not only endorsed these statements (Johnson Trial Testimony at 22–28), but at the close of the December 20 discussion, Mr. Buirkle also stated that it was ironic that they were talking about "buying Mr. Harris out, when in fact we should be putting him in jail." (*Id.* at 28).

The next day, the participants were joined by Mr. Wells' attorney, Mr. Connell, and by Victory's attorney, Mr. Singer. Buirkle presented Wells' offer to purchase Victory's interest in Arochem. Although Wells offered less money than Harris, Wells' offer included releases from litigation against Victory for its alleged associa-

tion with Harris' looting and lack of effort to remove him from Arochem's management (*Id.* at 30–36). Mr. Connell stated that he was a "tough, East Coast litigator" (*Id.* at 36), and that his client Wells would sue Victory if it sold to Harris, and the lawsuit would be unpleasant.

We would be brought up in front of a jury. I would be cross-examined by him and be made to show that I was a party to thefts of the company, thefts that could have aggregated as much through that period of time as 40 million dollars; generally indicating that you better take a good, hard look at the portion of the consideration that's not cash, i.e., that is the releases, don't underestimate the value of those.

And his role in this meeting was to convey to us how valuable, how important it was for us not to go up against him and up against Mr. Wells and to take their deal otherwise a lot of bad things would happen to us.

*Id.* at 36–37.

Apparently, Victory felt that the meeting was a "set up;" that its purpose was not to discuss settlement of the litigation between Wells and Victory, but rather to provide a forum for Wells and Buirkle to malign Harris and urge acceptance of their competing offer (*See* Johnson Tr. Test. at 26; *cf.* at 35, 85; Pl. Mem. on Privilege at 10).

On January 11, 1990 Mr. Harris and his representatives met in New York City with Eric Johnson of Victory and others to complete the sale of Victory's interest in Arochem to Harris. The parties had resolved most of the open issues, and seemed prepared to close the transaction, when Mr. Johnson privately told Mr. Harris that Victory would not proceed with the sale because of Wells' and Buirkle's statements at the December 20 and 21, 1989 meeting (*Id.* at 37–46, Harris Tr. Test. at 22–25).

The closing was postponed until February, while Victory investigated Mr. Harris' finances and management of Arochem. By the time the investigation was finished and Victory was once again ready to sell its Arochem interest to Mr. Harris, the corporate parent of his source of financing

(Drexel Burnham Lambert Trade Finance Inc.) was in bankruptcy, and the transaction never closed.

Mr. Harris and Arochem then filed this lawsuit against Mr. Buirkle, claiming defamation and tortious interference with the contract and business relationship between Harris and Victory. These allegations rest on Mr. Buirkle's statements at the December 20, 1989 and December 21, 1989 meetings with Victory and on his advancement of litigation expenses to Mr. Wells.

Because under California law, which applies to Buirkle's statements, the challenged statements are privileged, the court directed a verdict in defendant's favor.

## DISCUSSION

### I. CHOICE OF LAW

■ The basis of jurisdiction is diversity, so the choice of law rules of the forum state—New York—are used to determine which state's substantive law applies. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *American Protein Corp. v. Ab Volvo,* 844 F.2d 56, 62 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988); *Machleder v. Diaz,* 801 F.2d 46, 51 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987).

### A. New York State's "Interest Analysis" Rule.

■ In *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), the New York Court of Appeals adopted the "interest analysis" test, which applies the substantive law of that state "which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issues raised in the litigation." *Id.* at 481, 240 N.Y.S.2d 743, 191 N.E.2d 279. The *Babcock* court explained that generally, where a loss distribution rule is at issue, the law of the parties' residence applies. Where a rule governing conduct is at issue, the law of the place of the wrong applies.

Where the defendant's exercise of due care in the operation of his automobile is in issue, the jurisdiction in which the allegedly wrongful conduct occurred will usually have a predominant, if not exclusive, concern. In such a case, it is appropriate to look to the law of the place of the tort so as to give effect to that jurisdiction's interest in regulating conduct within its borders, and it would be almost unthinkable to seek the applicable rule in the law of some other place.

*Id.* at 483, 240 N.Y.S.2d 743, 191 N.E.2d 279. Presumptively, therefore, the state where the conduct occurs is recognized as having the greatest interest in regulating it, by imposing liability on those who violate its standards and protecting those who conform with its laws. *See Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 198–99, 491 N.Y.S.2d 90, 95–96, 480 N.E.2d 679 (1985) (citing Restatement [Second] of Conflicts of Law § 145, comment d, at 417–18).

In this case, defendant Buirkle's allegedly libelous statements were made at a private meeting in California, and that is the only place the statements were published. Under *Babcock,* New York would apply California's rules regulating that conduct.

### B. The Restatement [Second] of Conflicts of Law on the Choice of Law in Defamation Actions.

Restatement [Second] of Conflicts of Laws (hereinafter Restatement) § 149 states: "In an action for defamation, the local law of the state where the publication occurs determines the rights and liabilities of the parties, except as stated in § 150...."

Mr. Harris relies on § 150(2):

When a natural person claims that he has been defamed by an aggregate communication [i.e. one with extensive circulation], the state of most significant relationship will usually be the state where the person was domiciled at the time, if

the matter complained of was published in that state.[1]

However, § 150(2) by its own terms does not apply: first, because Buirkle's statements were not an "aggregate" communication; and second, because his statements were never published in Connecticut. *See Davis v. Costa–Gavras*, 580 F.Supp. 1082, 1091 (S.D.N.Y.1984) ("In a libel case, the state of most significant relationship is usually the state where the plaintiff was domiciled at the time, *if the libel was published in that state*, since that is where he is presumed to have been most injured." (Citing Restatement § 150(2)) (emphasis added)). *Cf., Grass v. News Group Publications*, 570 F.Supp. 178, 186 (S.D.N.Y.1983) (defamatory statements published locally are subject to law of place of publication, although plaintiff resides in another state).[2] Buirkle's statements were not published in any instrument of mass media and not published in Connecticut. Restatement § 150(2) is inapplicable, and Restatement § 149 controls.

### C. *Plaintiffs' Connecticut Residence and the Locus of the Tort.*

Plaintiffs argue that the law of the locus of the tort applies, and the locus is Connecticut because they suffered injury there. *See Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146, 1150 (S.D.N.Y.1989); *In re AM Int'l, Inc. Sec. Litig.*, 606 F.Supp. 600, 609 (S.D.N.Y.1985) ("where the jurisdiction of the alleged negligent conduct and that of the injury differ, the law of the place of injury generally governs.") (citations omitted); *Reeves v. American Broadcasting Cos.*, 580 F.Supp. 84, 90 (S.D.N.Y.), *aff'd*, 719 F.2d 602 (2d Cir.1983) (although nationwide television broadcast emanated from Washington, plaintiff's reputation was injured in California where plaintiff resided.)

In *Babcock*, 12 N.Y.2d at 477 n. 2, 240 N.Y.S.2d 743, 191 N.E.2d 279, the court discussed three possible loci of a tort: the "place of the wrong," the "place of the injury," and the "place of the tort" which designates a place where both wrong and injury occur. Here, the combined "place of the tort" concept is inapposite. The question is whether California, the place of conduct, or Connecticut, the place of injury, has the greater interest.

Because the statements were made in California, by participants in, and with reference to, litigation then pending in California, that is the state which has the greatest interest in the application of its laws to actions based on those statements. Furthermore, even if California law does not apply to all the issues in the case, it applies to the specific issue of whether Mr. Buirkle's statements are actionable. *See Davis*, 580 F.Supp. at 1091 (citing Restatement § 150(e)); *Id.* at 1093 (In defamation cases, "Strong policy reasons exist for deciding issues whose major impact is on the behavior of potential defendants according to the rules of the jurisdiction where the conduct that gives rise to liability takes place, especially when that conduct may be protected speech.") (citations omitted); *Bio/Basics Int'l v. Ortho Pharmaceutical*, 545 F.Supp. 1106, 1113–14 (S.D.N.Y.1982). *See also*, Restatement § 163. *Cf. Block v. First Blood Assocs.*, 691 F.Supp. 685, 698–99 (S.D.N.Y.1988) (Under California's "governmental interest" test, "New York has a compelling interest in policing tortious conduct committed in New York, by a New York attorney, with reference to future or pending litigation in New York." Therefore New York law applied, although plaintiff was a California resident.)

Standing alone, plaintiffs' residence is not enough to determine the choice of law. *See Zerman v. Sullivan & Cromwell*, 677 F.Supp. 1316, 1318–19 (S.D.N.Y.1988); *El Cid, Ltd. v. New Jersey Zinc Co.*, 575

---

1. Restatement § 150(3) is an analogous provision applicable to corporations.

2. See *Grass*, 570 F.Supp. at 186:
   This is not a case ... where articles in a national or regional publication, or statements which obviously will get a national exposure, focus on an individual in a remote area of the country. In such a case, one may readily state that the publisher should realize that he would be subject to the laws of the subject's domicile *if there were a republication in that jurisdiction.*
   (emphasis added).

F.Supp. 1513, 1519–20 (S.D.N.Y.1983). Plaintiffs rely on *Machleder v. Diaz*, 801 F.2d at 51–52, in which the Second Circuit held that New Jersey law applied to a defamation claim based on a television news broadcast brought by a New Jersey resident against a New York broadcasting company. However, in *Machleder* the plaintiff was interviewed in New Jersey, the report was part of a series prepared by a New Jersey reporter, and the broadcast was transmitted among other places, to Northern New Jersey. *See also Reeves*, 580 F.Supp. at 90 (California had greatest interest in defamation action not only because plaintiff was a California resident, but also because nationwide broadcast aired in California and centered on an investigation of activities which occurred in California); *El Cid*, 575 F.Supp. at 1519 ("While ... cases have indeed applied the laws of the jurisdictions in which the plaintiffs were located, those jurisdictions were, in addition, the sites of other events or circumstances crucial to the causes of action themselves."); *Grass*, 570 F.Supp. at 186 (New York law applies where Pennsylvania plaintiff sued New York magazine with essentially local circulation and libelous statements related to qualifications of candidate for New York State governor).

Accordingly, California law defines the scope of the protection afforded to these statements.

## II. THE SCOPE OF CALIFORNIA'S PRIVILEGE STATUTE

Under California law, to be actionable, defamatory statements must be both false and unprivileged. *See* Cal.Civ.Code §§ 45, 46. California Civil Code § 47(b) provides that "A privileged publication or broadcast is one made— ... 2. In any (1) legislative or (2) judicial proceeding, ..."

■ Although originally restricted to defamation actions, the privilege is now applied to all torts except malicious prosecution. *Silberg v. Anderson*, 50 Cal.3d 205, 212, 266 Cal.Rptr. 638, 642, 786 P.2d 365, 369 (1990). The privilege is absolute, and is not affected by malice or other bad motive of the speaker. *Id. See also, Ri-*

*bas v. Clark*, 38 Cal.3d 355, 364, 696 P.2d 637, 643, 212 Cal.Rptr. 143, 148–49 (1985) (tortious nature and purpose of defendant's actions does not negate privilege); *accord, Financial Corp. of America v. Wilburn*, 189 Cal.App.3d 764, 777, 234 Cal.Rptr. 653, 660 (6th Dist.1987) ("Plaintiffs' premise is that the subjective intent, purpose, or knowledge of a writer can destroy the privileged status of otherwise privileged statements. The law is otherwise.")

The statements must satisfy four criteria. "[T]he privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relationship to the action." *Silberg*, 266 Cal.Rptr. at 642, 786 P.2d at 369 (citations omitted). "Further, it applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved." *Id.* (citations omitted).

### A. *Buirkle's Statements Were Made in the Course of a Judicial Proceeding.*

■ Under California law, statements made in pursuit of settlement are part of judicial proceedings. *See Rosenthal v. Irell & Manella*, 135 Cal.App.3d 121, 126, 185 Cal.Rptr. 92, 95 (2d Dist.1982); *Asia Inv. Co. v. Borowski*, 133 Cal.App.3d 832, 843, 184 Cal.Rptr. 317, 324 (3d Dist.1982) ("Settlements of disputes has [sic] long been favored by the courts and attorneys should be accorded wide latitude in making statements during settlement negotiations."); *O'Neil v. Cunningham*, 118 Cal. App.3d 466, 475, 173 Cal.Rptr. 422, 427 (1st Dist.1981). To the extent that Buirkle threatened further lawsuits if the Victory/Harris contract closed, such threats are privileged as long as further litigation of this nature was genuinely contemplated by Messrs. Wells and Buirkle, and the prior and subsequent behavior of the parties leaves no doubt that it was. *See Wilburn*,

234 Cal.Rptr. at 660; *Fuhrman v. California Satellite Systems,* 179 Cal.App.3d 408, 420–23, 231 Cal.Rptr. 113, 118–19 (3d Dist. 1986); *Rosenthal,* 185 Cal.Rptr. at 95; *Izzi v. Rellas,* 104 Cal.App.3d 254, 163 Cal.Rptr. 689 (2d Dist.1980); *Larmour v. Campanale,* 96 Cal.App.3d 566, 568–59, 158 Cal. Rptr. 143, 144–45 (4th Dist.1979); *Lerette v. Dean Witter Org. Inc.,* 60 Cal.App.3d 573, 577–78, 131 Cal.Rptr. 592, 594–95 (2d Dist.1976). Plaintiffs offered no evidence, and did not contend, that the threats were a sham.

### B. *Buirkle Was a Participant Authorized by Law.*

Mr. Buirkle, although not a litigant, was an "other participant authorized by law" by virtue of the Joint Litigation Agreement (Joint Tr. Exh. 21) he had with Mr. Wells, an actual litigant. *See Doctors' Company v. Superior Court,* 225 Cal.App.3d 1284, 275 Cal.Rptr. 674, 680–82 (3d Dist.1990) (where insurer provides defense for party, realities of its role dictate that insurer is authorized participant for purpose of section 47(2), since insurer has vital stake in progress and outcome of litigation); *accord, Rosenthal,* 185 Cal.Rptr. at 95; *Izzi,* 163 Cal.Rptr. at 695.[3] *See Abraham v. Lancaster Community Hosp.,* 217 Cal. App.3d 796, 823, 266 Cal.Rptr 360, 377 (2d Dist.1990) (local medical community members have substantial interest in outcome of pending litigation against local doctor and are entitled to privilege as authorized participants); *ITT Telecom Prods. v. Dooley,* 214 Cal.App.3d 307, 316–17, 262 Cal. Rptr. 773, 778 (6th Dist.1989) (statutory language does not confine privilege to witnesses, parties, and attorneys); *Profile*

*Structures, Inc. v. Long Beach Bldg. Material,* 181 Cal.App.3d 437, 444, 226 Cal. Rptr. 192, 196 (2d Dist.1986) (bank and university which held assets that could become subject to attachment are authorized participants); *Costa v. Superior Court,* 157 Cal.App.3d 673, 678, 204 Cal.Rptr. 1, 4 (1st Dist.1984). The Joint Litigation Agreement gave Mr. Buirkle a vital financial stake in the course and outcome of the litigation, making him an authorized participant.[4]

### C. *Buirkle's Statements Were Made to Achieve the Objects of the California Litigation.*

The requirement that the communication be in furtherance of the objects of the litigation is, in essence, simply part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e. that it not be extraneous to the action.... The "furtherance" requirement was never intended as a test of a participant's motives, morals, ethics or intent.

*Silberg,* 266 Cal.Rptr. at 647, 786 P.2d at 374. *See Howard v. Drapkin,* 222 Cal. App.3d 843, 863–64, 271 Cal.Rptr. 893, 905 (2d Dist.1990). The object of the ongoing and the threatened litigation was that Victory sell its Arochem interest to Wells rather than to Harris. The purpose of Buirkle's statements was to persuade Victory that it would be best to accede to Wells' demands, and thus obtain, among other things, releases from litigation. Because Buirkle's statements were, in fact, in furtherance of the objects of the litigation, his motive for making them and Wells' motive for calling the meeting, even if malicious,

---

**3.** Plaintiffs cannot rely on *Moukalled v. Fire Ins. Exchange,* 271 Cal.Rptr. 588, 595 (2d Dist.1990) which reached the opposite conclusion with respect to insurers. The California Supreme Court, denying review, ordered that *Moukalled* be not officially published. Under Rule 977 of the California Rules of the Court, an unpublished opinion has no precedential value in an unrelated case.

**4.** *See also O'Neil,* 173 Cal.Rptr. at 426–27.
On its face, the *absolute* privilege of section 47, subdivision 2 ... addresses itself to a publication "made in any judicial proceed-

ing." It does not address itself to either the defamer or to the defamed.... [In other situations] when the Legislature intended to limit either the defamer or the defamed in connection with the claim of privilege, it said so.

.    .    .    .    .

The contrast between the [old] version and the [new] version of section 47, subdivision 2, is so striking as to suggest that the Legislature intended to insulate from any liability in defamation anybody who, in a judicial proceeding, said or wrote anything about anybody.

are not material. *See Wilburn,* 234 Cal. Rptr. at 659.

### D. *The Statements had Some Connection or Logical Relation to the Action.*

The California courts construe broadly the requirement of connection or logical relation to the action. *See Thornton v. Rhoden,* 245 Cal.App.2d 80, 86–93, 53 Cal. Rptr. 706, 711–16 (2d Dist.1966) (statement must have some connection with proceedings, but need not meet technical requirements of relevancy, materiality or pertinency. "[D]oubts are to be resolved in favor of relevancy and pertinency; that is to say, the matter to which the privilege does not extend must be so palpably wanting in relation to the subject matter of the controversy that there can be no reasonable doubt of its impropriety." 53 Cal.Rptr. at 716.) (quoting Veeder, Absolute Immunity in Defamation, Judicial Proceedings (1909) 9 Colum.L.Rev. 463, 600, 612). *Accord, Cayley v. Nunn,* 190 Cal.App.3d 300, 235 Cal.Rptr. 385 (2d Dist.1987); *Profile Structures,* 226 Cal.Rptr. at 194–95; *Costa,* 204 Cal.Rptr. at 3; *Izzi,* 163 Cal.Rptr. at 693. Buirkle's statements were relevant to persuading Victory to settle its California action with Wells on terms favorable to Wells.

Since under California law Mr. Buirkle's statements fall within the privilege afforded to statements made in the course of judicial proceedings, they are not actionable. Plaintiffs' defamation claim therefore fails. To the extent that plaintiffs' claims for tortious interference are based on those statements, they fail for the same reason.

### E. *Defendant's Allegedly Tortious Course of Conduct.*

█ Plaintiffs allege that aside from those statements, Buirkle engaged in a tortious course of conduct to interfere with their contract and business relationship with Victory. They assert that they are entitled to introduce Buirkle's statements to demonstrate his tortious course of conduct. *See White v. Western Title Ins. Co.,* 40 Cal.3d 870, 888, 221 Cal.Rptr. 509, 518, 710 P.2d 309, 318 (1985) (en banc) (while suit based squarely on privileged statements cannot be sustained, suit based on underlying course of conduct evidenced by such statements can be sustained, and privileged statements are admissible to prove underlying acts if underlying acts are independently tortious.) Plaintiffs rely on *Pacific Gas & Elec. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1132–33 n. 12, 270 Cal.Rptr. 1, 8–9, 791 P.2d 587, 594–95 (1990) (en banc) where the court observed that "while it could be argued that an exhortation to sue might be privileged, financing and otherwise promoting the litigation would not be." However, the only evidence of conduct introduced at trial against Buirkle was that he financed Wells' litigation against Harris. (Harris Trial Test. at 33–38). That action does not constitute an independent tort. *Pacific Gas & Elec.,* 270 Cal.Rptr. at 11–12, 791 P.2d at 597–98:

> Not every person who wishes to achieve the object of a lawsuit, or who is involved in the bringing of a lawsuit, is a named party. In fact, we have no public policy against the funding of litigation by outsiders. If any person who induced another to bring a lawsuit involving a colorable claim could be liable in tort, free access to the courts could be choked off with an assiduous search for unnamed parties.... It is essentially seeking to abort the lawsuit by starving the litigant of funds.
>
> ... It is repugnant to this basic philosophy [ie. the basic philosophy of the legal system] to make it a tort to induce potentially meritorious litigation ...

(citations omitted). Buirkle's underlying course of conduct was not independently tortious, and plaintiffs' intentional interference claims fail.[5]

### DISPOSITION

By error, a judgment was entered on June 12, 1991, reciting that "the jury [had]

---

5. Even if Connecticut law, rather than California law, were applied to Buirkle's provision of financing to Wells, that does not amount to tortious interference under Connecticut law. *See generally, Blake v. Levy,* 191 Conn. 257, 464 A.2d 52 (1983).

returned a verdict in favor of the defendant." An Amended Judgment, reflecting the direction of the verdict by the court at the close of plaintiffs' case, is being filed herewith.

## AMENDED JUDGMENT

This court having granted defendant's motion for a directed verdict at the close of plaintiffs' presentation of their case to the jury, and a judgment dated June 12, 1991 having been entered, erroneously reciting that "the jury [had] returned a verdict in favor of defendant," it is hereby

ORDERED that the Judgment dated June 12, 1991 is vacated; and it is further ADJUDGED that plaintiffs' complaint is dismissed on the merits with costs and disbursements to defendant as provided by law.