Milton A. RUDIN, Plaintiff,

v.

DOW JONES & COMPANY, INC., Defendant.

No. 79 Civ. 0433 (MEL).

United States District Court, S. D. New York.

March 26, 1981.

Warner & Gillers, P. C., New York City, for plaintiff; Kenneth E. Warner, Richard A. Greenberg, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for defendant; Robert D. Sack, Renee L. Cohen, New York City, of counsel.

LASKER, District Judge.

Dow Jones & Company, Inc. ("Dow") is the publisher of "Barron's Business and Financial Weekly" ("Barron's"), a weekly publication containing news and information of particular interest to the business and financial community. On November 27, 1978, in its regular column "Up & Down Wall Street," Barron's commented on the purchase of stock in the Great Lakes Dredge and Dock Company by a group including Frank Sinatra, Jr., his attorney Milton Rudin and three others:

"A GAMBLING stock it isn't, But then, Great Lakes Dredge and Dock would scarcely be mistaken for a Vegas casino. As for Atlantic City, we suspect that the closest the company would come to that spa is if perchance one of its dredges were working offshore. So why would Frank Sinatra and a group of four others, including his attorney, Milton Rudin (who not long ago joined Sinatra in buying a huge stake in Del Webb and eventually gaining a board seat before disposing of their stock this year to Ramada Inns), plunk down a cool $2.8 million to buy 107,500 shares, or slightly over 5% of the outstanding stock, of Great Lakes?

The 13D filed with the SEC by Sinatra & Friends avers that the stock was purchased for 'investment purposes.' The folks at Great Lakes Dredge can't shed any more light on the matter, either. They report that business is good, profits are at record levels and the backlog is high. But as to why old Blue Eyes et al acquired the block of stock, an executive

declares, 'We've no idea whatsoever.' Our efforts to reach the singer and others were to no avail. One thing we do know. Say what you want about Great Lakes Dredge, a fine old company with a respectable record, show biz it's not."

(Barron's, November 27, 1978, p. 37).

Rudin wrote to Barron's in response to this item on January 2, 1979. His letter was published by Barron's on January 15, 1979 in the column "Barron's Mailbag" which consists of letters to the editor. Barron's caption for the letter, appearing in printface slightly larger than the printface of the contents of the letters and in all capitals, was "SINATRA'S MOUTH-PIECE." The letter was published as follows:

"SINATRA'S MOUTHPIECE

To the Editor:

I have finally found time to deal with trivia; I am referring to the article which appeared in the Nov. 27 issue of your publication concerning the purchase by Harvey Silbert, Frank Sinatra, Jerry Weintraub and myself of over 100,000 shares of Great Lakes Dredge & Dock Co.

Your article seems to indicate that neither Mr. Sinatra and I, nor the other individuals joining us in filing as 'a group,' have a limited amount of intelligence. Obviously, you are of the view that we can only understand gambling stocks or securities of companies involved in the entertainment industry.

But it astounds me that your staff, writing for a publication that claims that it reports accurately on matters relating to investments, did not have intelligence to understand why we purchased Great Lakes. In addition to being unintelligent, they are evidently very lazy.

If your writer had examined the 13D filed with the SEC, he would have noted that initial purchases were made by Mr. Sinatra and myself at a cost basis of approximately $22 a share. Also, the subsequent purchases were made under $30 a share.

On the basis of $22 a share, and noting that Great Lakes paid a dividend of $2.50 a share in 1978, your reporter, if he completed sixth grade education, should have been able to note that we are getting a 10% return on our investment.

We bought the stock prior to the announcement that Great Lakes' earnings would be approximately $7 a share. Because we don't read Barron's, I guess we very stupidly invested in this stock, which at present price levels is yielding about 7% per annum and selling at a modest multiple of five times earnings.

MILTON A. RUDIN
Beverly Hills, Calif."

On January 16, 1979 Rudin's law firm sent a telegram to Barron's stating *inter alia* that the caption "SINATRA'S MOUTHPIECE" was a defamatory reference to Rudin in that it impugned his professional integrity and competence. The telegram also contained a demand that Barron's print an appropriate retraction. On January 22, 1979, the "Barron's Mailbag" column began with the following editorial statement:

"Milton Rudin, an attorney who represents Frank Sinatra, has objected to our referring to him as 'Sinatra's mouthpiece' in last week's Mailbag column. We meant to cast no aspersions on Mr. Rudin. Our dictionary defines 'mouthpiece' as 'spokesman.'

Under New York law,[1] a publication is libelous per se and therefore actionable without allegation or proof of special damages, if it

" '. . . tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community, even though it may impute no moral turpitude to him' . . . [or] tends to disparage a person in the way of his office, profession or trade." *Nichols v. Item Publishers, Inc.*, 309 N.Y. 596, 600–01, 132 N.E.2d 860 (1956); quoting *Mencher v.*

---

1. The parties agree that the same standard governs no matter which state's law is applied.

We have generally relied on New York law for the purposes of this aspect of the motion.

*Chesley,* 297 N.Y. 94, 100, 75 N.E.2d 257 (1947).

Rudin alleges that Dow's use of the phrase "Sinatra's Mouthpiece" tended to disparage him in the way of his profession by suggesting that he "lacked intelligence, integrity and independence as an attorney and as a businessman-investor." (Complaint ¶ 8). Dow moves to dismiss the claim pursuant to Fed.R.Civ.Pr. 12(b)(6) on the grounds that (1) the term "mouthpiece" is not reasonably susceptible of the defamatory meaning ascribed to it by Rudin and (2) in light of Dow's retraction, no cause of action for libel exists in the absence of a claim for special damages under applicable California law.

## I.

*The Meaning of the Term "Mouthpiece"*

■ The dispositive question raised by Dow's argument that its publication of the phrase "Sinatra's Mouthpiece" was not defamatory as a matter of law is whether "the words are susceptible of the meaning ascribed to them," *James v. Gannett Co.,* 40 N.Y.2d 418, 421, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976), considering the publication in its context and giving the words their natural import and plain and ordinary meaning, *November v. Time, Inc.,* 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963). The publication must be tested by its affect upon the average reader. *James v. Gannett Co.,* 40 N.Y.2d at 421, 386 N.Y.S.2d 871, 353 N.E.2d 834. In making the threshold determination whether words are susceptible of a defamatory meaning, the words must not be accorded a forced and unnatural meaning which might make them libelous, *Lorentz v. R. K. O. Radio Pictures,* 155 F.2d 84, 87 (9th Cir.) *cert. denied,* 329 U.S. 727, 67 S.Ct. 81, 91 L.Ed. 629 (1946), nor should the words be interpreted according to their mildest and most inoffensive sense in order to find them non-libelous. *Mencher v. Chesley,* 297 N.Y. 94, 99, 75 N.E.2d 257 (1947).

Relying on Webster's Third International Dictionary, Dow contends that the plain meaning of the word "mouthpiece" is "spokesman" and demonstrates that courts and the press have often used the word in that sense. *F. C. C. v. Allentown Broadcasting Corp.,* 349 U.S. 358, 362, 75 S.Ct. 855, 858, 99 L.Ed. 1147 (1955) ("We agree with the contention of the Commission . . . Fairness to communities is furthered by a recognition of local needs for a community radio mouthpiece."); *Ruby v. American Airlines, Inc.,* 329 F.2d 11, 25 (2d Cir. 1964) (Friendly, J., dissenting), *vacated* 381 U.S. 277, 85 S.Ct. 1456, 14 L.Ed.2d 430 (1965) ("it was by no means unnatural that O'Connell, the prospective future head of the merged group, should occasionally have been the mouthpiece for proposals for the engineers. . . ."). In addition, Dow argues that the context in which it used the phrase "Sinatra's Mouthpiece" contradicts the meaning ascribed by Rudin. According to Dow, since Rudin's letter was written on behalf of Sinatra and others and Rudin expressed that fact in the letter itself, the word "mouthpiece" as used by Dow could only have meant "spokesman."

Dow does concede that the word "mouthpiece" may be defamatory if used to associate one with a person or cause held in public contempt. However, Dow argues that calling Rudin "Sinatra's Mouthpiece" does not identify Rudin with a person or cause held in public contempt because Rudin does not claim that Sinatra is held in public contempt. Moreover, Dow contends that even if the caption was derogatory, it does not follow that it was defamatory. Rather, Dow maintains that its use of the term "mouthpiece" expressed at most an unflattering view of Rudin akin to mere name-calling. According to Dow, the caption was not capable of inflicting substantial harm to Rudin's reputation and therefore under the "mere epithet" rule it is not defamatory. *See Curtis Publishing Co. v. Birdsong,* 360 F.2d 344, 348 (5th Cir. 1966) (phrase " 'those bastards' " could only be understood as a "mere epithet" expressing "a strong emotional feeling of dislike" rather than "as statements of fact").

Rudin argues that the term "mouthpiece" not only means "spokesman," as Dow con-

tends, but also has a pejorative connotation, especially when applied to an attorney. Rudin notes that the Oxford English Dictionary itself states that "mouthpiece" is a slang term for "criminal lawyer" and, Rudin demonstrates, its additional slang meanings are "an unscrupulous criminal lawyer" or a lawyer "in sympathy with the underworld." *The American Thesaurus of Slang* (1942). The term is, Rudin contends, synonymous with "puppet, cat's paw, tool, instrument, operative, front, mercenary, servant, hireling, henchman." Rodale, *The Synonym Finder* (1978). Moreover, Rudin points to various cases in which courts have used "mouthpiece" in this pejorative sense. *E. g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 355, 94 S.Ct. 2997, 3014, 41 L.Ed.2d 789 (1974) (Burger, C. J., dissenting) ("irresponsible reporters . . . might, for example, describe the lawyer as a 'mob mouthpiece' for representing a client with a serious prior criminal record"); *Johnson v. United States*, 360 F.2d 844, 846 (D.C.Cir.1966) (quoted below). In addition, Rudin demonstrates that the press and the bar have used the term in this sense. *E. g., ABA Standards Relating to the Administration of Criminal Justice, Compilation* (1974), p. 110 (quoted below). Thus, Rudin claims, the term "mouthpiece" is reasonably susceptible of a defamatory meaning when applied to a reputable attorney, since it suggests a lack of professional integrity.

Rudin also argues that use of the term "mouthpiece" in reference to an attorney impugns the attorney's ethical standards. As Rudin emphasizes, the Code of Professional Responsibility requires that an attorney exercise independent judgment in the representation of his client. American Bar Association Code of Professional Responsibility (1975), Canons 1, 5, 7, 9; Ethical Considerations 1–1, 1–5, 3–3, 3–5, 5–1, 7–3, 7–4, 7–25, 26, 27; Disciplinary Rule 7–102. Rudin contends that Dow's caption implied that he merely did his client's bidding, without exercising his own independent judgment and thus that he failed to adhere to the ethical standards of his profession.

Rudin also rejects Dow's characterization of the caption as mere name-calling. Un-like epithets which are understood to express the speaker's emotions rather than assertions of fact, Rudin argues, the term "mouthpiece" is not generally understood as an angry or emotional appellation but rather as a description of a person's role or function. When applied to an attorney who is required to exercise independent judgment, it amounts to an attack on his professional integrity, according to Rudin.

Rudin further argues that the context in which the phrase appeared increased rather than diminished the defamatory connotation of the word mouthpiece. Rudin emphasizes that his letter was written not only on behalf of Sinatra, but also on behalf of himself and two other investors. The reference to Rudin as "Sinatra's Mouthpiece" was particularly harmful to his reputation as an attorney and a businessman-investor because it made it appear to Barron's readership that Rudin placed Sinatra's interests above that of other clients or fellow joint investors.

Finally, Rudin argues that even if the term "mouthpiece" is defamatory only when it is used to associate one with unpopular persons or causes, it was defamatory here because Sinatra is often portrayed as having organized crime affiliations. The term was therefore used to defame both Sinatra and Rudin insofar as it implied that Sinatra needed and employed a "mouthpiece" to speak for him and that Rudin is that "mouthpiece."

We find Rudin's arguments persuasive. In contradiction of Dow's assertion that the plain and ordinary meaning of "mouthpiece" is "spokesman," Rudin has convincingly demonstrated that the term is often used to refer to an attorney for organized crime and that it is understood to refer to someone who does another's bidding without the exercise of independent judgment. However innocuous the term may be when used to refer to someone whose job it is simply to express another's words or views, *e. g., F. C. C. v. Allentown Broadcasting Corp.*, 349 U.S. 358, 362, 75 S.Ct. 855, 858, 99 L.Ed. 1147 (1955); *Ruby v. American Air-*

*lines, Inc.*, 329 F.2d 11, 25 (2d Cir. 1964) (Friendly, J., dissenting), *vacated* 381 U.S. 277, 85 S.Ct. 1456, 14 L.Ed.2d 430 (1965), in the particular context of an attorney/client relationship the reference to an attorney as his client's "mouthpiece" can reasonably be found to imply a lack of professional integrity. As Rudin contends, the Code of Professional Responsibility affirmatively requires that an attorney exercise his independent professional judgment. It has been specifically recognized that an attorney who acts merely as his client's "mouthpiece" is not fulfilling the ethical requirements of the legal profession.

> "One result of these fallacious and blurred conceptions of the advocate's function is the public image of the 'criminal lawyer' as the *servile 'mouthpiece'* or the alter ego of the accused or one who does for the accused what the accused would do for himself if he had the legal skills. This is more than a *fallacy; it is totally incompatible with the basic duty of a lawyer as an officer of the court and contrary to the traditions and ethics of the legal profession.*
> A lawyer complying with the canons and traditions of the bar advocates but does not identify with his client. The alter ego or *'mouthpiece'* school of thought, which *is happily a minute fraction of the legal profession,* would carry this perverted notion to the point of complete identification of lawyer with client, i. e., the lawyer as an extension of the accused himself with a community of interest, motivation and goals, bound to engage in falsehood and chicane at the command of the client. *These concepts have long been rejected by the legal profession and find no acceptance among honorable members of the bar." Johnson v. United States,* 360 F.2d 844, 866 (D.C.Cir.1966) (Burger, J., concurring) (emphasis added, footnote omitted).

Indeed, the bar has stated that it demeans an attorney to be viewed as his client's mouthpiece:

> "The second role of counsel is as intermediary. This is not to say that the caricature, in which counsel becomes mere

'mouthpiece' for or alter ego of his client, is a valid description of this role ... From time to time over the past one hundred years or more, in both England and America, an occasional voice is raised advocating what has come to be known as the 'alter ego' theory of advocacy. The thesis depicts defense counsel as an agent permitted, and perhaps even obliged, to do for the accused everything he would do for himself if only he possessed the necessary skills and training in the law; in short, that the lawyer is always to execute the directives of the client. This spurious view has been totally and unequivocally rejected for over one hundred years under canons governing English barristers and is similarly rejected by canons of the American Bar Association and other reputable professional organizations. It would be difficult to imagine anything which would more gravely demean the advocate or undermine the integrity of our system of justice than the idea that a defense lawyer should be simply a conduit for his client's desires." *American Bar Association Standards Relating to the Administration of Criminal Justice, Compilation* (1974) p. 110.

In addition, the context of the Barron's statement supports Rudin's position. Barron's is a publication which appeals primarily to the business and financial community. It can reasonably be expected that its readers are somewhat more familiar both with the role of a civil attorney and his professional obligation to exercise his independent judgment and with the roles of fellow joint investors than the average citizen. To the extent that the caption implied a lack of independence as an attorney or a lack of consideration for fellow joint venturers, it can reasonably be found at trial to have harmed Rudin's reputation as an attorney and as a businessman-investor. Furthermore, Rudin is entitled to show at trial that, given the nature of Barron's, the readership of the publication would not view the term "mouthpiece" as mere name-calling. As Rudin contends and Dow does not deny, Barron's is not the type of publication

which regularly engages in name-calling. Furthermore, Rudin's interpretation is at least somewhat strengthened by the fact that Dow chose to refer to Rudin as "Sinatra's Mouthpiece" even though it is reasonably clear from the contents of the letter that he was not writing only for Sinatra.

Finally, it could be reasonably found at trial that Dow used the phrase in precisely the same manner in which Dow concedes that it may be defamatory—by associating Rudin with a person whom the jury might find to be unpopular, namely Sinatra. It is impossible to hold from the face of the complaint that Rudin would be able to prove no set of facts to support the proposition that Sinatra is popularly rumored to be associated with organized crime and therefore that the caption was reasonably understood to mean that Rudin is a mob mouthpiece, especially in light of the mysterious aura conveyed by Barron's earlier article about the group's investment.

In sum, the caption "Sinatra's Mouthpiece" is reasonably susceptible of the meaning ascribed to it by Rudin. While Dow correctly points out that the term "mouthpiece" is often used to mean no more than "spokesman," it is at least clear that when used in reference to an attorney, it can also convey a defamatory meaning. Since the publication at issue here is reasonably susceptible of the two meanings, one innocent and the other defamatory, it is up to the jury to decide which meaning was actually conveyed. *Rovira v. Boget*, 240 N.Y. 314, 316–17, 148 N.E. 534 (1925). Accordingly, Dow's motion to dismiss the complaint on the ground that the caption is not reasonably susceptible of a defamatory meaning is denied.

## II.

*The Effect of Dow's January 22, 1979 Publication*

Under New York conflict of law rules, the substantive law to be applied in a tort case is the law of the forum with the most significant contacts with the alleged tort. *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970). Dow argues that California law must be applied here because Rudin is a citizen of California where Barron's is distributed and thus Rudin suffered the most significant injury there. Dow then contends that its January 22, 1979 editorial statement constituted an appropriate retraction under California Civil Code § 48a(1) and (2) so that Rudin has no claim for libel absent special damages.

Rudin contends that it is premature to decide the choice of law issue on the present state of the record because in this case there are significant contacts with New York as well as California. Rudin emphasizes that (1) Dow's activities are centered in New York, (2) it is likely that Barron's circulation is greater in New York than California and (3) Rudin's reputation is not limited to California, but extends to a significant degree to New York, and thus Rudin's domicile should not automatically dictate which state's law applies. Rudin also argues that the California retraction statute is inapplicable because Barron's is not a newspaper and that even if Barron's is held to be a newspaper, the sufficiency of Barron's retraction must be decided by the trier of the facts.

Rudin's arguments on this issue prevail. To be sure, in a libel action "the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state." Restatement (Second) of Conflict of Laws, § 150(2) (1977). But where the plaintiff has a significant relationship to a state other than the state of his domicile, other factors must be considered in determining which law to apply. *Id.* at § 150(2), comment *e*; Note, *The Choice of Law in Multi-State-Defamation—A Functional Approach*, 77 Harv.L.Rev. 1463 (1964). As the court in *Palmisano v. News Syndicate Company, Inc.*, 130 F.Supp. 17, 20 (S.D.N.Y.1955) stated, the plaintiff's domicile "should not be transformed into a rigid rule" for determining choice of law issues in libel actions. Rather, the following factors are also relevant to the choice of law issue:

"(1) the state of plaintiff's domicile;

(2) the state of plaintiff's principal activity to which the alleged defamation relates;

(3) the state where plaintiff in fact suffered the greatest harm;

(4) the state of the publisher's domicile or incorporation;

(5) the state where defendant's main publishing office is located;

(6) the state of principal circulation;

(7) the place of emanation;

(8) the state where the libel was first seen; and

(9) the law of the forum." (130 F.Supp. at 19, n.2)

Like the court in *Palmisano*, we find that these issues cannot be sufficiently considered on a motion to dismiss addressed to the face of the complaint. Accordingly, the motion to dismiss on the basis of California law is denied without prejudice to its renewal on a sufficient record.

In any event, Rudin has raised serious questions as to whether the California retraction statute would apply here since by its terms it applies only to newspapers, not to magazines. *Alioto v. Cowles Communications, Inc.*, 519 F.2d 777 (9th Cir. 1975); *Montandon v. Triangle Publications, Inc.*, 45 Cal.App.3d 938, 120 Cal.Rptr. 186 (1st Dist. 1975). Under the rationale of *Alioto*, Barron's may be a magazine rather than a newspaper because, as a specialized weekly publication, it might not be "under pressure to disseminate 'news while it is news'" but rather may "have the advantage of greater leisure in which to ascertain the truth of allegations before publishing them." 519 F.2d at 779.[2] In addition, there is some support for Rudin's argument that the question of whether Dow's retraction was fair and complete rather than snide and insincere, as Rudin contends, is for the jury to decide. *See Behrendt v. Times-Mirror Co.*, 30 Cal.App.2d 77, 85 P.2d 949 (1939).

Since the determination that Barron's is a magazine rather than a newspaper would make it irrelevant whether California or New York law is applied here, it would be more expedient for that issue to be determined before the choice of law issue is decided. Because the present state of the record is insufficient to make that determination now, the parties should conduct the necessary discovery and submit further papers on the question whether Barron's is a newspaper or a magazine for the purposes of the California retraction statute. If it is then determined that Barron's is a newspaper, discovery may proceed on the choice of law issue.

In sum, Dow's motion to dismiss the complaint pursuant to Fed.R.Civ.Pr. 12(b)(6) is denied without prejudice to its renewal upon a showing that Barron's is a newspaper for purposes of the California retraction statute and that California law applies.

It is so ordered.

---

**2.** We note that the recent decision of a California trial court in the Carol Burnett case that the National Enquirer publication is a magazine rather than a newspaper under § 48a(1) appears to support Rudin's position.