Alex GRASS, Plaintiff,

v.

NEWS GROUP PUBLICATIONS, INC., Publisher of *New York Magazine* and the *New York Post,* Michael Kramer and Fred M. Alger, Defendants.

Alex GRASS, Plaintiff,

v.

Eli JACOBS, Defendant.

Nos. 82 CIV 2533 (LBS), 82 CIV 6111 (LBS).

United States District Court, S.D. New York.

May 13, 1983.

As Amended Aug. 9, 1983.

Sharfman, Shanman, Poret & Siviglia, P.C., New York City, for plaintiff Alex Grass; Richard M. Sharfman, Charles I. Poret, Mark R. Kook, New York City, of counsel.

Squadron, Ellenoff, Plesent & Lehrer, New York City, for defendants News Group Publications, Inc., Michael Kramer and Eli Jacobs; Neal M. Goldman and Stuart Bondell, New York City, of counsel.

Willkie, Farr & Gallagher, New York City, for defendant Fred M. Alger; Anthony F. Phillips, Philippe M. Salomon and Laurence H. Lenz, Jr., New York City, of counsel.

## OPINION

SAND, District Judge.

Defendants News Group Publications, Inc., Michael Kramer and Eli Jacobs seek a ruling prior to trial that plaintiff Alex Grass is a limited purpose public figure under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and that the law of New York State governs plaintiff's libel and right of privacy claims. Defendant Fred M. Alger moves for summary judgment pursuant to Fed.R. Civ.P. 56(b).

The following facts are not in dispute. Lewis Lehrman announced his candidacy for the office of Governor of New York in January, 1982. As a part of his campaign strategy, Lehrman emphasized in speeches and radio and television commercials his responsibility for building Rite Aid, Inc. into the third largest chain of drugstores in the country. Lehrman joined Rite Aid in 1964 and served as its president from 1969 until 1977. He became chairman of its executive committee in 1977. He resigned that post and his position on the Rite Aid board of directors in January, 1982 in order to devote full time to his gubernatorial campaign.

Alex Grass, the plaintiff in this action and Lehrman's former brother-in-law, founded Rite Aid Corporation in 1962 along with several other associates. Rite Aid expanded the activities of a predecessor wholesale grocery business into a specialized retail drugstore chain. Grass has held the position of chief executive officer of Rite Aid from its inception.

Rite Aid and Alex Grass have numerous contacts with New York State. Grass maintains an apartment in New York City. Rite Aid is listed on the New York Stock Exchange. Although headquartered in Pennsylvania, there are 202 Rite Aid drugstores in New York State as compared to 206 stores in Pennsylvania.

The defendants in these actions are News Group Publications, Inc., publishers of *New York Magazine* and the *New York Post,* Michael Kramer, a political reporter for *New York Magazine,* and Fred M. Alger and Eli Jacobs, both of whom have been associated with Rite Aid in some capacity in the past. *New York Magazine* and the *New York Post* are distributed primarily in New York City and New York State.

In January, 1982, shortly after Lehrman's resignation from Rite Aid, a series of letters were sent to various newspapers and magazines in New York State from Rite Aid headquarters in Pennsylvania on Rite Aid stationery over the signature of Patrick Early, Rite Aid's director of communications. The letters were similar in content, each one noting that the publications in question had in one way or another published an article which contained an "inaccuracy" with regard to Mr. Lehrman's prior relationship with the Rite Aid Corporation. For example, the following letter, dated January 12, 1982, was sent to the *New York Times* editorial page editor:

To the Editor:

Recent articles about Lewis E. Lehrman's gubernatorial campaign have incorrectly identified him as chairman of the board of directors of the Rite Aid Corporation. Alex Grass is the chairman of the board of Rite Aid. Mr. Lehrman has never been chairman of the board nor has he ever been chief executive officer of the corporation.

Mr. Lehrman served as president of Rite Aid from 1969 until 1977. In 1977, he was named chairman of the executive committee. He resigned that post and his position on the Rite Aid board of directors effective Tuesday, January 5, 1982. As a result of that action, Mr. Lehrman no longer holds any office with the corporation nor is he an employee of Rite Aid.

Yours truly,
Patrick M. Early,
Director of Communications

Another letter, dated February 23, 1982, was sent in response to an article that appeared in *The Recorder,* a publication in Amsterdam, New York:

Dear Ms. Patrick:

Your article in the January 25 edition of the Recorder dealing with the gubernatorial candidacy of Mr. Lewis Lehrman described Mr. Lehrman as the head of the Rite Aid chain.

Mr. Lehrman does not head the Rite Aid corporation. Alex Grass is president and chairman of the board of Rite Aid.

Mr. Lehrman served as president of Rite Aid from 1969 to 1977. In 1977, he was named chairman of the executive committee. He resigned that post and his position on the Rite Aid board of directors effective Tuesday, January 5, 1982. As a result of that action, Mr. Lehrman no longer holds any office with the corporation nor is he an employee of Rite Aid.

Yours truly,
Patrick M. Early,
Director of Communications

A review of the letters shows them to be similar in tone. In each instance, the letter corrects a technically inaccurate description of Lehrman as the former "chief" or "head" of Rite Aid (he was the former president) or of Lehrman as the "founder" of Rite Aid (he joined the company in 1964, two years after it began). The letter then would explain when Lehrman joined the company, his position with the company, and the fact that he had severed his connection with Rite Aid as of January 5, 1982. Often the letter would state that Grass, not Lehrman, had founded the company in 1962 and that Grass, not Lehrman, was now and had always been the company's chief executive officer.

The concept of monitoring the press coverage of the Lehrman campaign in New York State and responding to any perceived inaccuracies by the writing of letters was discussed with Alex Grass and approved by him. The decision apparently was prompted by a discussion between Alex Grass and Martin Grass, Alex Grass' son and an executive of Rite Aid. Martin Grass expressed his belief that Rite Aid would be subject to substantial media attention as a result of Mr. Lehrman's decision to run for governor, and that it would be a good idea to "protect" Rite Aid from what he perceived as the possibility of "negative" coverage. Deposition of Alex Grass, Ex. R., Affidavit of Neal M. Goldman, at 244; Deposition of Martin Grass, Ex. V, *supra,* at 29–33. Alex

Grass testified that while he did not review the language of each individual letter, he had approved the concept of sending such letters. Deposition of Alex Grass, *supra,* at 244.

One such letter was sent to Michael Kramer, a political reporter for *New York Magazine* and a defendant in this action. The letter was prompted by an article written by Mr. Kramer entitled "Koch-22," which was published in *New York Magazine* on February 15, 1982. The article contained a reference to Mr. Lehrman that was perceived by Rite Aid's personnel to be inaccurate. Mr. Kramer had referred to Mr. Lehrman as the man who "started the Rite Aid drugstore chain." The letter read:

> Dear Mr. Kramer:
>
> In recent articles about Lewis E. Lehrman's gubernatorial campaign, your publication has described Mr. Lehrman as the "founder" of the Rite Aid Corporation. Rite Aid was founded in 1962 by Alex Grass, who has always been the CEO of the company, and other associates. Mr. Lehrman didn't join the company until 1965. He served as president of Rite Aid from 1969 until 1977. In 1977, he was named chairman of the executive committee. He resigned that post and his position on the Rite Aid board of directors effective Tuesday, January 5, 1982. As a result of that action, Mr. Lehrman no longer holds any office with the corporation nor is he an employee of Rite Aid.
>
> > Yours truly,
> > Patrick M. Early
> > Director of Communications

Kramer had been preparing an article on the Lehrman candidacy when he received the letter. He testified at deposition that he thought the letter "strange" in that it "conveyed a tone which seemed to minimize Mr. Lehrman's role in Rite Aid." Deposition of Michael Kramer, submitted in support of Fred M. Alger's Motion for Summary Judgment, at 177. Edward Kosner, Kramer's editor at *New York Magazine,* testified that he too found the letter to "circumscribe Lehrman's role with the company." Deposition of Edward Kosner, *supra,* at 34. Kosner and Kramer agreed that Kramer should follow up on what appeared to be the conflicting perceptions as to Lehrman's role in developing Rite Aid.

Kramer thereafter interviewed Lehrman, Grass and several other Rite Aid officers and executives. Some of these interviews took place in Pennsylvania; others took place in New York or by telephone between New York and Pennsylvania. Drawing on the interviews and other information, Kramer wrote the article entitled, "Who Is This Guy Lew Lehrman?", published in the April 5, 1982 issue of *New York Magazine,* which forms the basis of this litigation. According to Grass, the article quotes statements made by two of the individual defendants in this action, Mr. Jacobs and Mr. Alger, which allegedly defamed him in his business and invaded his right of privacy. Moreover, Grass maintains that Kramer misquoted these sources and likewise misrepresented and denigrated Grass' role in the development and success of the Rite Aid Corporation.

Prior to the publication of the allegedly defamatory article, eighteen letters were sent to various New York State newspapers and magazines "correcting" allegedly inaccurate references to Lehrman and his past association with Rite Aid. Rite Aid continued to monitor the New York press after the Kramer article that is the subject of this action. Grass himself appeared on television and gave interviews on the subject of his dispute with Lehrman.

Prior to the publication of the second Kramer article, Grass had been interviewed and written about in numerous trade publications, often discussing his role in making Rite Aid one of the most successful drugstore chains in the country.

## DISCUSSION

### *Plaintiff's Status*

█ The defendants News Group Publications, Inc., Michael Kramer and Eli Jacobs seek a ruling declaring Alex Grass a limited purpose public figure under the

standard set forth in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). This determination is one for the court to make as a matter of law. *See Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966); *Hotchner v. Castillo-Puche,* 404 F.Supp. 1041, 1045 (S.D. N.Y.1975), *reversed on other grounds,* 551 F.2d 910 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

In *Gertz v. Robert Welch, supra,* the Supreme Court held that the constitutional privilege first enunciated in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and later extended to public figures in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), did not apply in a libel action brought by a private figure plaintiff. In distinguishing the public from the private figure, the Court noted:

> For the most part, those who attain (the status of public figure) have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

418 U.S. at 345, 94 S.Ct. at 3009.

Two factors appear to underlie the greater freedom accorded the press in scrutinizing the activities of public figures. First, the assumption that by virtue of their status or their affirmative actions with respect to a particular issue, public figures have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood." *Id.* By voluntarily assuming the risk of public scrutiny—by "inviting attention and comment"—public figure plaintiffs are less deserving of the protection of the libel laws. *See id.* Second, because public figures generally enjoy significant access to the media, they are better able to respond to false statements concerning their reputation—they are less suscepti-

ble to injury. *See id.,* at 344, 94 S.Ct. at 3009.

In contrast to the limited purpose public figure, the private figure plaintiff is one who is "dragged unwillingly into the controversy." *Wolston v. Reader's Digest Association, Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). The petitioner in *Wolston,* for example, failed to respond to a subpoena of a grand jury investigating Soviet intelligence activities in the late 1950s. He was cited for contempt. Over a decade later, in 1974, he became the subject of an allegedly libelous magazine article that accused him of being a Soviet intelligence agent. On these facts, the Supreme Court found the petitioner to be a private figure, "dragged unwillingly" into a controversy. *Id.* at 166, 99 S.Ct. at 2707. Wolston's failure to respond to the grand jury subpoena, said the Court, "was in no way calculated to draw attention to himself in order to invite public comment or influence the public with respect to any issue." *Id.,* at 168, 99 S.Ct. at 2707.

Similarly, the Court determined in *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), that a research scientist was a private figure where the alleged libel arose out of a press release naming the scientist's funding source as the recipient of Senator William Proxmire's Golden Fleece Award for wasteful government spending. The Court pointed out that any access Hutchinson might have had to the media was the result of the alleged libel and not of his position prior to the bestowing of the award. More important, the Court noted that neither the publication of scientific articles nor the application for federal grants "invite[d] that degree of public attention and comment" essential to meeting the public figure criteria. *Id.,* at 135, 99 S.Ct. at 2688. Indeed, rather than "inviting attention," Hutchinson had become the subject of public debate solely as a consequence of the activities of others—in this case, the presentation of the Golden Fleece Award and the press attention that it prompted. As Chief Justice Burger observed, "Those charged with defa-

mation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Id.* (citing *Wolston v. Reader's Digest Association, Inc., supra,* 443 U.S., at 167–68, 99 S.Ct. at 2707).

With these distinctions in mind, we look to the nature and extent of this plaintiff's participation in the controversy giving rise to the alleged defamation. *See Gertz v. Robert Welch, supra,* 418 U.S., at 352, 94 S.Ct. at 3013. The critical question is whether, by virtue of Grass' own actions and those of his subordinates at Rite Aid, he can be said to have thrust himself into the public view by attempting to shape and influence an issue of public concern, thereby inviting media attention and assuming the risk of an increased likelihood of libel; or whether, by virtue of the acts of Michael Kramer and the other defendants, he is more fairly characterized as having been "involuntarily dragged" into a public controversy—transformed into a public figure as a result of the acts of the press and others.

■ We conclude that, on the facts of this case, the more reasonable view and the view more readily supported by the evidence is that Alex Grass voluntarily thrust himself into the limelight, invited comment, and indeed initiated public debate on an issue of obvious public import—the extent to which Lewis Lehrman, a candidate for the Republican Party nomination for Governor of New York, had overstated his contribution to the success of Rite Aid.

Prior to the publication of any allegedly libelous statements, Alex Grass authorized what can only be described as a deliberate, voluntary plan to monitor the press coverage of the Lehrman campaign in New York State for purposes of "correcting" all inaccuracies with respect to Lehrman's relation to Rite Aid. This is not an instance where a passive party was forced, by virtue of what he perceived to be a libelous publica-

tion, to seek out the press in the first instance in order to vindicate his good name. There are no allegations that statements published prior to the second Kramer article were defamatory, or that the Early letters were written in response to any allegedly libelous statements. Nor is this a case, like *Hutchinson,* where the acts of a third party drew the attention of the media to an unsuspecting and unwilling private citizen. Finally, this is not a case where the press decided to focus on the plaintiff in the absence of voluntary action on the plaintiff's part. *Compare Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

There is a suggestion in the deposition testimony that the monitoring of the Lehrman campaign was a purely defensive action taken to avoid any adverse business consequences that might result from public confusion over Lehrman's relationship with Rite Aid. It is clear, however, that the letters written by Early did more than merely advise that Lehrman was no longer connected with Rite Aid. They contained affirmative statements with respect to Mr. Grass and a description of Mr. Grass' role in the Rite Aid organization. Any contention that the letters were sent solely to avoid a possible boycott of the Rite Aid stores by Democrats or others not sympathetic to Lehrman's campaign is therefore belied by the nature of the letters themselves.

Even if it had been Mr. Grass' intent merely to achieve the more limited purpose of clearing up public confusion over Lehrman's relationship with Rite Aid, the critical question is how Grass' actions would have been reasonably perceived by others, especially members of the press. In this case, we find that a reasonable person would have concluded that Mr. Grass and Rite Aid were seeking to influence the outcome of an issue of obvious public concern: Lewis Lehrman's prior business experience with Rite Aid.[1]

1. We do not mean to suggest that one who merely replies to comments about one's company in the news media necessarily is attempting to draw attention to or influence a public controversy. *See Waldbaum v. Fairchild Publica-*

*tions, Inc.,* 627 F.2d 1287, 1298 n. 31 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). The question is a factual one and nearly always one of degree: Did the plaintiff voluntarily act to invite comment and

The reactions of Michael Kramer and Edward Kosner appear reasonable under the circumstances. Both testified at depositions that they thought the tone of the letter written to Kramer was one which denigrated Mr. Lehrman's role. Given the emphasis in the Lehrman campaign on Mr. Lehrman's responsibility for the success of Rite Aid, it is both reasonable and predictable that the apparent undercutting of that claim by his former brother-in-law and chief executive officer of Rite Aid would be viewed as an affirmative act intended to draw the attention of the press to an issue of public concern. Indeed, by directing letters to the press of the nature and content described, Rite Aid achieved exactly what was intended: an increased awareness on the part of the press (and therefore the public) of Lehrman's and Grass' relative responsibilities for the success of Rite Aid. Mr. Grass cannot draw the attention of the press to an issue in which he is a central character and, at the same time, seek to characterize his behavior as passive.

In concluding that Grass voluntarily prompted discussion of a significant public issue, we cannot ignore the fact that the letter-writing campaign and the comments made in the Kramer interview took place in the midst of a hotly-contested political contest. It is difficult to imagine an issue of public concern more appropriate for vigorous scrutiny on the part of the press than the qualifications of a political candidate for public office, or the motivations of one who reasonably appears to question the accuracy of these claimed qualifications.

In focusing on the political circumstances surrounding this litigation, we by no means suggest that the degree of public interest in an issue determines a defendant's entitlement to the *New York Times* privilege. That approach, adopted by a plurality of the Court in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), was rejected in *Gertz, supra.* We merely suggest that when an individual affirmatively acts to influence the outcome of an issue so obviously and predictably central to a public election, it is more than reasonable to assume that the actor was aware of the very great likelihood that his actions would attract legitimate press attention—that his actions would be viewed as "inviting" public comment, thereby greatly increasing the likelihood of potential libel.[2]

We also find relevant the fact that Grass had significant access to the press on the issue of Mr. Lehrman's relationship to Rite Aid. As its founder and chief executive officer, Grass was an obvious source of information with respect to Lehrman's rela-

to create the controversy, or was the plaintiff reacting to a controversy for which he had little or no responsibility. As Judge Tamm noted in *Waldbaum:*

"Those who attempt to affect the result of a particular controversy have assumed the risk that the press, in covering the controversy, will examine the major participants with a critical eye. Occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome. Unless he rejects any role in the debate, he too has "invited comment" relating to the issue at hand. In any event, media coverage of a controversy can be expected to include reports on a major participant's reply to misstatements about him. In short, *the court must ask whether a reasonable person would have concluded that this individual would play or was seeking to play a major role in determining the outcome of the controversy and whether the alleged defamation related to that controversy.*

627 F.2d, at 1298 (emphasis added).

2. No doubt it is true, as the plaintiff argues, that there was no major "public controversy" to speak of regarding the respective roles of Grass and Lehrman in the success of Rite Aid at the time the letters were first sent and prior to the publication of Mr. Kramer's allegedly libelous article. We do not find that fact dispositive, however. If public debate on the particular issue of public concern must exist prior to one's purposeful actions, then an unknown figure who voluntarily steps forward to raise new or related issues of public concern would remain a private figure despite subsequent public and press focus. The question is whether "a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution." *Waldbaum v. Fairchild Publications, supra,* 627 F.2d, at 1297. We have no doubt that the issue of Lehrman's responsibility for the success of Rite Aid was predictably of this broader public nature.

tionship to Rite Aid and his prior business experience. Indeed, a number of reporters were in contact with Rite Aid in response to the Early letters; in some instances, newspapers printed the letters. Grass was well covered in the trade press prior to the Kramer article. While access to the media is not in any sense dispositive of the public figure issue, the fact that Grass had significant access to the press prior to the publication of the allegedly libelous statements and even greater access after publication has some weight in our determination that he is a limited purpose public figure. *See Gertz, supra,* 418 U.S. at 344 & n. 9, 94 S.Ct. at 3009 & n. 9.

Finally, we note that a finding that Mr. Grass is a private figure is not compelled on the grounds that he may not have intended to place his personal reputation in the public limelight, and did not personally review the letters sent over the signature of the Rite Aid public relations director. Mr. Grass authorized the letter writing program on behalf of Rite Aid, and his reputation in the business community is solely related to Rite Aid. Because Mr. Grass was specifically mentioned in the letters sent on behalf of Rite Aid, we find that a reasonable person would view Grass as having thrust his own reputation into the public eye, at least with respect to the specific issues prompted by those letters.

For all of the reasons stated above, we find that Alex Grass is a limited purpose public figure for the purposes of this litigation.

*Choice of Law*

■ The usual presumption with regard to choice of law questions is that the plaintiff in a defamation or privacy action may invoke the law of the plaintiff's domicile. *See* Restatement (Second) of Conflicts of Law, § 150(2). Underlying this presumption is the view that the plaintiff's domicile is generally the place in which he enjoys the reputation allegedly besmirched, where he works and where he enjoys his privacy. Plaintiff urges that these considerations are fully operative here.

■ We have concluded, however, that a New York court, to whose practices we must defer in this diversity action, *Klaxon Company v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), would hold that New York law controls this controversy. Under New York choice of law rules, the substantive law to be applied in a tort case is the law of the forum with the most significant contacts with the alleged tort. *E.g., Nader v. General Motors Corp.,* 25 N.Y.2d 560, 307 N.Y. S.2d 647, 255 N.E.2d 765 (1970). While this is usually the law of the plaintiff's domicile, where the plaintiff has a significant relationship to a state other than the state of his domicile, other factors must be considered in determining which law to apply. Restatement (Second) of Conflict of Laws § 150(2), comment e. As Judge Lasker noted in *Rudin v. Dow Jones & Co.,* 510 F.Supp. 210 (S.D.N.Y.1981), the plaintiff's domicile " 'should not be transferred into a rigid rule' for determining choice of law issues in libel actions." *Id.,* at 216 (quoting *Palmisano v. News Syndicate Co.,* 130 F.Supp. 17, 20 (S.D.N.Y.1955)).

■ In determining that the plaintiff is, for purposes of this litigation, a limited purpose public figure, we have found that he created and thrust himself into a controversy relating to claims being made by a candidate for the office of Governor of New York State. When Mr. Lehrman announced his candidacy, plaintiff approved a plan to monitor the press solely in New York, and not in Pennsylvania, the plaintiff's domicile and principal place of business. Indeed, this was a correct assessment of media coverage, for it appears that there was literally no Pennsylvania press coverage of the Grass-Lehrman contretemps prior to this confrontation.

The explanation furnished for limiting the press survey and letter writing to New York is that the plaintiff was concerned that Rite Aid, which had hundreds of stores in New York State, might suffer adverse consequences if New York customers boycotted the stores because of Lehrman's politics. Although we find that the letters

went beyond satisfying that concern for purposes of our determination of the public figure question, we note that even the plaintiff's explanation of the reason for that activity is focused on New York.

We have considered various other factors in reaching this determination. First, we note in particular that the defendants' publications involved in this litigation are peculiarly local in nature. They make no pretense of being national publications. The circulation of the alleged defamation in Pennsylvania was *de minimus* in contrast to the circulation in New York.

Second, plaintiff is no stranger to New York. Indeed, he comes to this state with sufficient frequency as to maintain a personal apartment in New York City.

Third, although Rite Aid has its principal headquarters in Pennsylvania, its reputation in New York is in many respects of greater concern to it than is the case with Pennsylvania. Rite Aid is listed on the New York Stock Exchange. Plaintiff has addressed investor groups in New York. The division between New York and Pennsylvania of Rite Aid retail outlets is almost equal. There are 202 in New York and 206 in Pennsylvania.

Grass' professional reputation is closely linked with Rite Aid. Rite Aid is the only business concern with which he has ever been associated since leaving the practice of the law, so that to the extent that Rite Aid's reputation is related to New York, so too is that of the plaintiff's.

We believe, on balance, that the defendants could reasonably have assumed that they were dealing within the context of the New York criteria for liability under a libel or right of privacy claim. We recognize that this point is not crystal clear. Rite Aid's original letter to Kramer was mailed from Pennsylvania. Kramer interviewed the plaintiff in Harrisburg. However, this is not a case, such as *Hutchinson v. Proxmire, supra,* where articles in a national or regional publication, or statements which obviously will get a national exposure, focus on an individual in a remote area of the country. In such a case, one may readily

state that the publisher should realize that he would be subject to the laws of the subject's domicile if there were a republication in that jurisdiction. Here, for the reasons set forth above, the defendants' focus was reasonably on New York, the center of gravity is in New York, and New York is the place to which the plaintiff caused letters to be written.

We recognize that, particularly with respect to privacy, a strong claim can be made for affording the plaintiff the protections recognized by his own state and circumscribed by the law of this forum. At the same time, however, New York has a significant interest in encouraging its press to investigate and report on events of great public interest. In this respect, New York may well have chosen to afford its press institutions greater freedom than has the Pennsylvania legislature or the courts of Pennsylvania. And in this case, where the issues concern the qualifications of a candidate for Governor, New York's interest in robust debate and uninhibited reportage is a most significant one indeed. Moreover, as we have noted, Mr. Grass was well aware or should have been well aware that any affirmative actions taken to influence the resolution of issues in regard to Mr. Lehrman's campaign would be of obvious public interest and that such interest would be focused in New York.

For all these reasons, we conclude that New York has the most significant contacts with this litigation and that this Court should apply New York law.

*Motion for Summary Judgment*

Defendant Fred M. Alger moves for summary judgment pursuant to Fed.R.Civ.P. 56(b), arguing that the allegedly defamatory words attributed to him are statements of "rhetorical hyperbole" and opinion absolutely protected under the First Amendment. Alger rests this proposition on such cases as *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). According to

Alger, these cases establish that expressions of opinion or criticism, inherently incapable of being proven true or false, may not form the basis of a libel action.

■ It is true that words that are merely "rhetorical hyperbole" or loose terms of "abuse and opprobrium" are not actionable. *Greenbelt Publishing Association v. Bresler, supra; Curtis Publishing Co. v. Birdsong*, 360 F.2d 344, 348 (5th Cir.1966). One cannot be sued simply for expressing his opinion of another, "however unreasonable the opinion or vituperous the expressing of it may be." *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir.) (citations omitted), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). Similarly, words that convey concepts "whose content is so debatable, loose and varying, that they are insusceptible to proof of truth or falsity" are considered statements of pure opinion absolutely protected by the First Amendment. *Buckley v. Littell,* 539 F.2d 882, 894 (2d Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 777 (1977). Moreover, "[o]pinions, false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions, provided that the facts supporting the opinions are set forth." *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 380, 397 N.Y. S.2d 943, 950, 366 N.E.2d 1299, 1306 (1977) (citing *Buckley v. Littell, supra,* 539 F.2d at 893).

■ Not all statements of opinion are, however, constitutionally protected as "pure" opinion or hyperbole. When statements of opinion convey the clear implication of underlying facts that would confirm the opinion but are unknown to the reader or listener, the words may be actionable. *See Hotchner v. Castillo-Puche, supra,* 551 F.2d, at 913. In addition, "opinions may support a defamation action when they convey false representations of defamatory fact, even though there is no implication that the writer is relying on facts not disclosed." *Cianci v. New York Times Publishing Co.,* 639 F.2d 54, 65 (2d Cir.1980).

■ The comments attributed to Mr. Alger in Michael Kramer's April 5 *New York Magazine* article, "Who Is This Guy Lew Lehrman?", are as follows:

"Lew took a sleepy little company and breathed life into it" says Fred Alger. "It was Lew's genius that took Rite Aid from being nothing into being really big. This is a pattern for companies. Many people play key roles, but it was Lew who made it go while Alex minded the store back home. Alex is having some kind of identity crisis. He was always in the shade when Lew was around. Lew ran both the family and the company even though he was younger. And that drove Alex crazy. Now the bitterness is oozing out and it's just awful. Alex should be ecstatic that Lew is doing so well, but Alex just isn't a very big guy."

This passage hardly qualifies as mere "rhetorical hyperbole." To be sure, individual words or expressions, viewed alone, merely express Alger's displeasure with a negative opinion of Mr. Grass. Yet, taken as a whole and viewed in context, the words are more than terms of "abuse and opprobrium."

Nor do we view Alger's allegedly defamatory statements as privileged expressions of pure opinion. A reasonable reading of the words suggests that they are, in Judge Friendly's words, "laden with factual content" directed to the respective roles of Grass and Lehrman in the building of Rite Aid. *Cianci v. New York Times Publishing Co., supra,* 639 F.2d, at 63. Indeed the voluminous record in this case addressed to this issue suggests the great number of disputed factual matters that underlie the allegedly defamatory statements. To the extent Alger's statements are properly characterized as opinion, the clear implication is that they are based on facts not stated in the article but known to Alger by virtue of his relationship with Grass, Lehrman and Rite Aid. Moreover, even if such facts were set forth by Alger in his interview with Kramer and subsequently edited out, as Alger contends, plaintiff in this action is alleging that such facts are false. In

such an instance, the expression of opinion becomes as damaging as the assertion of the facts. *See Hotchner v. Castillo-Puche, supra,* 551 F.2d, at 913. *Compare Rand v. New York Times Co.,* 75 A.D.2d 417, 423–24, 430 N.Y.S.2d 271, 275 (1st Dept.1980) (opinion not actionable where speaker set forth supporting facts which were subsequently edited out and where there was no allegation that such facts were false).

Defendant Alger argues that even if his words are not absolutely protected by the First Amendment, they do not constitute slander or libel *per se* under New York law. As such, Alger asks that we dismiss the complaint for failure to plead special damages.

Under New York law, which we have concluded should be applied under New York's choice of law rules (see pp. 14–18, *supra*), a statement or publication which concerns a person in his trade or business and tends to injure him therein is actionable *per se. Nichols v. Item Publishers, Inc.,* 309 N.Y. 596, 600, 132 N.E.2d 860, 861–62 (1956) (libel); *Vaca v. General Electric Credit Corp.,* 88 A.D.2d 740, 740, 451 N.Y.S.2d 869, 870 (3d Dept.1982) (slander); *McCullough v. Certain Teed Products Corp.,* 70 A.D.2d 771, 771, 417 N.Y.S.2d 353, 355 (4th Dept.1979) (slander). Unless the Court can determine as a matter of law that the statements in question could not have disparaged the plaintiff in his business or profession, it is for the jury to decide whether or not the statements had such an effect. *Katapodis v. Brooklyn Spectator, Inc.,* 287 N.Y. 17, 21, 38 N.E.2d 112, 113–14 (1941); *Schermerhorn v. Rosenberg,* 73 A.D.2d 276, 284, 426 N.Y.S.2d 274, 281 (2d Dept.1980). In making this determination, the Court is to view the words in their context. *Balabanoff v. Hearst Consolidated Publications,* 294 N.Y. 351, 355, 62 N.E.2d 599, 600–01 (1945); *accord, Cianci v. New York Times Publishing Co.,* 639 F.2d 54, 60 (2d Cir.1980). The central question is whether the words are "reasonably susceptible of a defamatory connotation." *James v. Gannett Co.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837 (1976), *quoted in, Cianci v.*

*New York Times Publishing Co., supra,* 639 F.2d, at 60.

The words attributed to Mr. Alger clearly could be understood to disparage the plaintiff in his business. One could reasonably conclude that they assert that Mr. Lehrman was the key to the tremendous success of Rite Aid and that Grass was simply the plodding, uncreative bookkeeper who "minded the store back home." That Mr. Alger refers to Rite Aid as a "sleepy little company" prior to the arrival of Mr. Lehrman reasonably could be construed to suggest that the company was financially stagnant at the time Lehrman joined it and, more important, that it would not have become the success it did had Lehrman not come along. A person reading these statements in the context in which they were made could reasonably conclude that Grass' talents as a businessman were lacking and that his position as chief executive officer at Rite Aid was little more than that of a figurehead, assigned to him because of prior association with the company. We cannot say as a matter of law that these words are not capable of the meaning plaintiff ascribes to them and that they could not be viewed as harming Mr. Grass in his business and profession.

The Court finds that the words are capable of the construction urged by the plaintiff and, as such, are actionable *per se* without the pleading of special damages.

## CONCLUSION

For the reasons set forth above, we find that the plaintiff, Alex Grass, is a limited purpose public figure and that New York law applies to this litigation. We find, in addition, that the words attributed to the defendant Fred M. Alger are defamatory *per se* under New York law and are not expressions of opinion absolutely protected under the First Amendment. Alger's motion for summary judgment must therefore be denied.

SO ORDERED.